**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Frances I. GOODWIN,**
**Defendant-Appellant.**

**Nos. 84–1183, 84–1980.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 9, 1985.

Decided Aug. 8, 1985.

Rehearing and Rehearing En Banc Denied Sept. 17, 1985.

---

Mary F. Harkenrider, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Constantine J. Gekas, Chicago, Ill., for defendant-appellant.

Before BAUER, COFFEY and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

Defendant-appellant Frances Goodwin appeals her convictions for wire fraud and

transporting securities and money in interstate commerce knowing the same to have been taken by fraud, in violation of 18 U.S.C. §§ 1343 and 2314 (1982). Her grounds for appeal are (1) that the district court erred in denying her request for an investigator under the Criminal Justice Act (18 U.S.C. § 3006A(e) (1982)); (2) that her Fifth Amendment right against self-incrimination was violated when the trial judge coerced her to testify at trial; (3) that the trial court erred in allowing the government to present certain rebuttal evidence; and (4) that the district court improperly denied her motion for a new trial based on newly discovered evidence. We affirm the convictions.

## I.

Frances Goodwin was indicted in May 1983 on one count of wire fraud and one count of interstate transportation of securities and money taken by fraud. 18 U.S.C. §§ 1343, 2314. The indictment alleged that Goodwin had fraudulently borrowed and never repaid approximately $48,000 from two families (the Tills and the Alexanders) with whom she was acquainted through their mutual membership in the Mormon Church.[1] Following a five-day jury trial, Goodwin was found guilty on both counts. She was sentenced to thirty months imprisonment on each count, to run concurrently.

The government proved at trial that the Tills and Alexanders had loaned large amounts of money to Goodwin because of her representations in 1981–1982 that she was involved, through a corporation called Terrauto, Inc., in producing and marketing mobile hospital units in foreign countries and that she would repay the money as soon as the deals were completed, which she told them would be very soon. Goodwin's descriptions of her business were quite elaborate, involving United States Senators Orrin Hatch and Charles Percy, an unnamed senator from Florida, Presi-

dent Reagan, a former Lebanese ambassador named Eli Lutfallah, at least twenty-five Arab countries, Spain, Mexico, Swiss bank accounts, private jets, three or four American corporations, and millions upon millions of dollars. The government alleged that Goodwin made up the entire story in an attempt to defraud the Tills and Alexanders into loaning her money that she did not intend to repay. Goodwin's defense was that she never intended to deceive anyone, and that the statements that she made to the Tills and Alexanders were either true or she believed them to be true, based upon what Eli Lutfallah and others had told her.

Goodwin was able to corroborate only a small fraction of the business scheme that she had described to the Tills and Alexanders. The evidence at trial showed that Goodwin had in fact established a Nevada corporation named Terrauto, Inc. on October 24, 1972, but that the charter had been revoked in 1974 for failure to file an annual list of officers and directors and to pay the filing fees thereon. Goodwin and the government stipulated that if Senator Hatch were to testify, he would state that he had met Goodwin in 1974 or 1975 when he was in private practice in Salt Lake City and that he had performed legal services for Goodwin and a man named Keith Brown in connection with a business venture of theirs that later failed, the name of which Hatch could not recall. The stipulation also stated that Senator Hatch had approached Goodwin in 1974 or 1975 as a possible marketing person for an unrelated company that he had formed in Salt Lake City but that the venture was never completed, and that he had not seen Goodwin since 1975. The stipulation further provided that in 1976, Senator Hatch heard that Goodwin had begun attempting to market mobile hospital units but that he had never aided her attempts to market the units.

---

1. The jurisdictional basis for the wire fraud count was Goodwin's calling Mr. Alexander from Florida and causing him to send her some money from Illinois in a Western Union telegraphic money order. The basis for the section 2314 count was the fact that $5,000 worth of checks that the Alexanders had written to Goodwin in Illinois had cleared through Kansas City, Missouri.

Lastly, Senator Hatch would testify that in November 1979, he was informed by a Florida attorney that Goodwin had been using his name as a reference, and that Hatch subsequently sent a mailgram to Goodwin stating that he had no business relationship with her and requesting that she refrain from using his name in business transactions.

Eli Lutfallah testified at trial that he had met Goodwin in Illinois in 1973 and that he had discussed her mobile hospital business with her. Ten days later, Lutfallah met in Lebanon with a man associated with Goodwin and signed a contract to represent Goodwin's company in Lebanon. He further testified, however, that he had not seen or spoken to Goodwin since that meeting with her representative, and that he never made any effort to market mobile hospital units pursuant to the contract.

Ted Koyzis, a native of Cyprus, testified that he had met with Goodwin on a number of occasions in the mid-1970's to discuss the possibility of his acting as a middleman between Goodwin and Arab countries for the sale of mobile hospital units. He broke off all business dealings with Goodwin in 1975, however, because she was never able to provide documentation that she could actually produce the units for sale.

## II.

### A. Denial of Request for Investigator

Goodwin's first argument is that the district court erred in denying her request for an investigator under 18 U.S.C. § 3006A(e). Section 3006A generally provides for the appointment of counsel for indigent defendants. Subsection (e) authorizes the court-appointed counsel to obtain investigative services in appropriate cases:

> Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for an adequate defense may request them in an ex parte application. Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain

them, the court ... shall authorize counsel to obtain the services.

18 U.S.C. § 3006A(e)(1) (1982). Goodwin's court-appointed counsel filed a request for an investigator on September 26, 1983, but did not explain why an investigator's services were necessary to Goodwin's defense. The trial judge denied the request without prejudice on October 7, without ever holding an *ex parte* hearing on the motion. Goodwin never renewed the request. Goodwin asserts that the district court erred in two respects: by ruling on her request for investigative services without first conducting an *ex parte* proceeding, and by denying her request.

■ Goodwin · interprets section 3006A(e)(1) as requiring that an *ex parte* hearing be held whenever a judge receives a request for investigative services, and that the trial judge thus erred by ruling on her request for an investigator without first holding such a hearing. We disagree. The plain language of section 3006A(e)(1) requires only that an *ex parte* proceeding be held before the court authorizes any investigative services, to ensure that the services are necessary and that the defendant is financially unable to obtain them before permitting public funds to be used for those purposes. We do not believe, although we can find no legislative history on this point, that Congress intended to require trial judges to hold an *ex parte* proceeding before considering or denying a request for investigative services when a defendant files a request for investigative services without, as here, even the barest of assertions that such services are necessary for an adequate defense. We believe that it would not be unduly burdensome, and would avoid potential delay and waste of judicial resources, to require a defendant to include in the request for investigative services a specific statement of why the services are necessary. *See United States v. Davis*, 582 F.2d 947, 951 (5th Cir.1978) (when requesting investigative services, defendant must show specifically the reasons why such services are necessary), *cert. denied*, 441 U.S. 962, 99 S.Ct. 2408, 60 L.Ed.2d 1067 (1979); *United States v.*

*Mundt,* 508 F.2d 904, 908 (10th Cir.1974) (same), *cert. denied,* 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 103 (1975). *But cf. United States v. Theriault,* 440 F.2d 713, 715 (5th Cir.1971) (error to deny § 3006A(e) request for psychiatrist without conducting *ex parte* proceeding when request alleged that psychiatrist necessary to an adequate defense), *cert. denied,* 411 U.S. 984, 93 S.Ct. 2278, 36 L.Ed.2d 960 (1973). Because Goodwin's request for services did not indicate why an investigator was necessary, what the investigator would do, and why Goodwin's attorney could not perform the investigative work needed, the trial court was not required to hold an *ex parte* proceeding before denying her request. We note that the court denied Goodwin's request for an investigator without prejudice, thus leaving her with every opportunity to refile a request that met these simple requirements.

■ The decision to grant or deny a request for services under section 3006A(e) is one committed to the discretion of the trial court, and will be overturned on appeal only for an abuse of discretion. *United States v. Alden,* 767 F.2d 314, 319 (7th Cir.1984). This circuit has held that an appropriate test for deciding whether investigative services are "necessary for an adequate defense" under section 3006A(e) is whether a reasonable attorney would engage such services for a client having the independent financial means to pay for them. *See Alden,* at 318. As noted above, Goodwin's request for an investigator did not explain why an investigator was necessary to her defense. Goodwin argues that if the judge had held an *ex parte* hearing, she could have established the necessity of the services. Goodwin's present explanation for why an investigator was necessary, however, is only that any attorney "worth his salt" would have obtained an investigator in this case because of the complex facts, the national and international ramifications, the fact that witnesses were spread throughout the United States, and the fact that at least four potential witnesses, including Senator Orrin Hatch, were in high-level government positions. Even accepting everything Goodwin says as true, she has still failed to explain why such factors make an investigator necessary or why her attorney could not have done whatever investigative work was necessary. *See United States v. Harris,* 542 F.2d 1283, 1315–16 (7th Cir.1976) (affirming denial of request for investigative services when no showing that attorney could not perform the work needed), *cert. denied,* 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977). This case was not one in which the government introduced complex facts of which the defendant was unaware and thus needed to investigate; here, Goodwin admits telling the Tills and Alexanders everything they testified that she told them, but asserts that she believed what she told them to be true. Goodwin therefore knew which people and companies existed and which did not, and should have known where to contact them since she testified that she had been dealing with them on a regular basis. It should have been even easier for her to find the four potential witnesses in high-level government positions, such as Senator Hatch, since their public roles make them easily accessible to the public. In the complete absence of any concrete explanation, either in the initial request or on appeal, for why an investigator was necessary to Goodwin's defense, we cannot say that it was an abuse of discretion for the trial court to deny Goodwin's request.

**B. Whether Trial Court Improperly Coerced Defendant to Testify**

The Fifth Amendment guarantees that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. Goodwin contends that her Fifth Amendment right against self-incrimination was violated when the trial court improperly coerced her to take the stand in her own defense. The government asserts that Goodwin's decision to testify was her own.

At the close of the government's case, Goodwin's counsel told the trial judge that

his client did not intend to take the stand, and asked that Goodwin affirm that decision on the record. Outside the presence of the jury, the trial judge asked Goodwin whether she had indeed decided not to testify. Goodwin responded, somewhat hesitatingly: "I don't know what would be best. Most of the things have been brought out. I just don't know. I feel that would probably be best." Goodwin affirmed that she understood her rights both to testify and not to testify, and asked to speak to her sons for a few minutes. Before recessing, the judge commented:

Well, what the Court is concerned with, among other things, is that the record be made crystal clear that this decision is being made intelligently, with full benefit of the advice of counsel and now with the benefit of consulatation [sic] with family members. It is an important decision.

I must say, frankly, that I am surprised by your decision. It has been my impression throughout this proceeding, both before and during the trial, as you have sat there and audible [sic] given your reactions to the testimony of the various witnesses for the benefit of the jury, that you maintain your innocence and take the position that the government witnesses are simply lying.

The chances of your creating a reasonable doubt in the minds of the jury, considering the evidence that they have heard in this case, seems to me to rest almost entirely upon your ability to persuade them that yours is in fact the truthful version of these occurrences. It is difficult to do that while standing mute.

On the other hand, to take the stand and compound previous lies by telling more lies and subjecting yourself to the skillful cross examination of these prosecutors would simply be aggravating an already bad situation.

Now, those are two of the considerations that are obvious on the face of the matter. I am sure you understand what I am saying, don't you?

Goodwin responded "Yes," and the court recessed for approximately twenty minutes to allow Goodwin to consult with three of her sons, aged 17, 19, and 23. When the judge returned, Goodwin's counsel told him that his client had been left with the impression that the judge was advising her to take the stand, and that if she did not take the stand, there was no way that the jury would find her innocent. The judge responded by saying:

Let me dispel any impression, Mrs. Goodwin, that I was attempting to steer you one way or the other. I was not.

What I was trying to do, to the best of my ability, was to outline the considerations in favor of and against your taking the stand because I want the record to show that you are cognizant of those considerations.

I did say that it seems to me that the evidence in the record is very incriminating and that your only chance of acquittal is if the jury has a reasonable doubt as to the truth of that testimony. Standing absolutely unrebutted, as it is at this moment, it does seem to me that the chances of the jury having a reasonable doubt as to the truth of the testimony they have heard are very small.

On the other hand, I could be absolutely wrong. I long ago ceased trying to predict what juries will do because nobody knows. They may have doubts that would never occur to me and they, of course, are the triers of the facts, not I.

So Mr. Kadish is quite correct. I wasn't trying to give you advice. I was just bending over backwards to make sure that this record shows that you are aware of the considerations and that you are making an intelligent decision based upon those considerations.

Now, what is your decision? Are you going to testify or are you not going to testify?

Goodwin replied: "I am going to testify." After Goodwin's counsel stated for the record that he had advised Goodwin not to testify, the trial judge made sure that Goodwin understood that by testifying, she

was going against the advice of her trial counsel. Goodwin then took the stand.

■ We find this colloquy disturbing. While we appreciate the trial judge's extreme care and solicitude in attempting to ensure that Goodwin's initial decision not to testify was voluntary, we believe that the judge went too far in this case. A trial judge must take great care not to assume the functions of trial counsel. The trial judge in this case went beyond his limited function of ensuring that Goodwin's decision not to testify was voluntary when he expressed surprise at her decision, explained some of the pros and cons of her taking the stand, and strongly implied that her only chance for acquittal was to testify. Although his observations may have been correct, they were not appropriate. A trial judge's role in this situation is limited to making sure that the defendant understands his or her rights and ensuring that the defendant's final decision is made voluntarily, with no coercion or undue influence. It is primarily the responsibility of the defendant's counsel, not the trial judge, to advise the defendant on whether or not to testify and to explain the tactical advantages and disadvantages of doing so. If a judge deems it necessary to comment on what he or she views as an inadvisable decision in this critical area, then the court should discuss the matter with the defendant's counsel. Discussing the issue directly with the defendant may inappropriately involve the judge in the unique attorney-client relationship, raising possible Sixth Amendment concerns as well as, in this case, the more obvious Fifth Amendment problems.

In spite of our misgivings about the trial court's comments in this case, however, we are not convinced that Goodwin's Fifth Amendment rights were thereby violated. The trial judge explicitly told Goodwin, after he was informed that she thought he was advising her to testify, that he was not trying to steer her one way or the other. Goodwin was given time to talk things over with her sons, had discussed the matter with her counsel at least three times previously, and was fully capable of making her own decision. We are certain that she took the judge's comments into consideration in making her decision, along with the comments of her family and her attorney, but we are not persuaded that her will was overborne. We therefore believe that, although this is a very difficult case because of the dialogue between the court and the defendant, Goodwin's decision to testify in her defense was ultimately her own.

■ Furthermore, even if the judge's comments did compel Goodwin to testify, in violation of the Fifth Amendment, we believe that the constitutional error was harmless beyond a reasonable doubt. *Cf. Chapman v. California*, 386 U.S. 18, 22–24, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967) (applying harmless beyond a reasonable doubt standard when prosecutor and court commented on defendants' failure to testify). Although Goodwin now asserts that she was prejudiced because she was prompted to testify with little or no apparent preparation, there is nothing in the record to support that assertion. In fact, it appears that Goodwin may have planned to testify at the outset of the trial, only to change her mind as the government's case developed. On the second day of trial, when the judge asked defense counsel how long his case would be, he responded "I would assume just the defendant at this point," although he indicated that others might also be called. When the judge later questioned Goodwin on whether or not she would take the stand, Goodwin's counsel noted that he and Goodwin had discussed the matter on at least three occasions during the course of the government's case. After Goodwin decided to go ahead and testify, her counsel did not seek a continuance to prepare her testimony. The record thus suggests that Goodwin may already have been prepared to testify.

Lastly, Goodwin argues that she was prejudiced because her testimony was "disjointed and garbled." We disagree. Her testimony was no more disjointed than that of the Tills and Mr. Alexander, who all testified as to what Goodwin had told them

about her scheme. Their testimony may all have seemed disjointed, but only because the business dealings Goodwin described were so complex. The record does not indicate to us that Goodwin's testimony was garbled or confused—she seemed to know exactly what she was talking about. It further appears from the record that the prosecutor's cross-examination of Goodwin was not particularly lengthy or harsh, and that she never wavered from her story under questioning. In sum, we find nothing in the record to suggest that Goodwin was prejudiced by taking the stand in her own defense.

We conclude that Goodwin's Fifth Amendment rights were not violated when she decided to testify at trial, and that any error that may have occurred was harmless beyond a reasonable doubt. We reiterate our lingering concern, however, that the trial judge's comments in this case, even though well-intentioned, came very close to resulting in improper coercion, and might have compelled us in a different factual setting to invoke our supervisory power.

### C. Scope of Government's Rebuttal Evidence

Goodwin next asserts that the trial court committed reversible error in allowing the government to present certain rebuttal evidence. As stated earlier, Goodwin's defense was that she believed everything that she had told the Tills and Alexanders to be true. In rebuttal, the government presented two FBI agents who testified that they had interviewed Goodwin about her business dealings on May 19, 1982. When the first agent began to describe what Goodwin had told them during the interview, defense counsel requested a side bar to express concern about the scope of rebuttal. The government maintained that it was merely trying to show inconsistencies in her various stories to the Tills and Alexanders, the FBI agents, and to the court on direct examination. The trial court overruled defense counsel's objection but stated that he would reverse himself if the

government "strays too far afield or far afield at all."

The prosecutor continued to question the FBI agent briefly about statements that Goodwin had made to him during the interview and about the agent's subsequent unsuccessful attempts to verify those statements. During the agent's testimony, defense counsel made at least six specific objections to the scope of rebuttal, two of which were sustained. The second FBI agent then briefly testified as to the contents of a briefcase that contained some of Goodwin's personal belongings and that he had opened pursuant to a search warrant. The briefcase had first been mentioned during the government's cross-examination of Goodwin. Defense counsel made no objections during the second agent's testimony.

A trial court has considerable discretion in determining the proper scope of rebuttal evidence. *United States v. Gaertner*, 705 F.2d 210, 217 (7th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 979, 79 L.Ed.2d 216 (1984); *United States v. Papia*, 560 F.2d 827, 848 n. 16 (7th Cir.1977). We find no abuse of discretion in the trial court's allowance of the government's limited rebuttal evidence in this case. The court closely monitored the scope of the government's rebuttal testimony, twice sustaining defense counsel's objections to continued testimony along the lines then being pursued.

Even if the court did commit error in allowing the government's rebuttal testimony, moreover, it would not be reversible error. Goodwin has made no showing that she was prejudiced by the government's rebuttal evidence, and we can imagine none. The evidence presented in rebuttal could have been introduced in the government's case in chief, and Goodwin was allowed to present witnesses in surrebuttal to counter the government's rebuttal case. We therefore reject Goodwin's argument that the trial court's admission of the government's rebuttal evidence requires reversal of her conviction.

## D. Denial of Motion for New Trial

 Goodwin's last argument is that the trial court erred in denying her timely motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure on the basis of newly discovered evidence. In order to obtain a new trial on the basis of newly discovered evidence, a defendant must show that the evidence in question (1) came to the defendant's knowledge only after trial; (2) could not have been discovered sooner through the exercise of due diligence; (3) is material, and not merely impeaching or cumulative; and (4) would probably lead to an acquittal in the event of a new trial. *United States v. Hendrix,* 752 F.2d 1226, 1234 (7th Cir.), *cert. denied,* — U.S. ——, 105 S.Ct. 2032, 85 L.Ed.2d 314 (1985); *United States v. Nero,* 733 F.2d 1197, 1202 (7th Cir.1984); *United States v. Davis,* 604 F.2d 474, 483 (7th Cir.1979).[2] These strict standards reflect the fact that such motions are not favored by the courts and are viewed with great caution. *Davis,* 604 F.2d at 483. It is even more difficult for a defendant to appeal successfully from a trial court's denial of his motion for a new trial, for we can reverse the court's judgment only upon finding an abuse of discretion. *See Nero,* 733 F.2d at 1202; *Davis,* 604 F.2d at 483.

 The evidence forming the basis for Goodwin's motion for a new trial consists of the results of an investigation conducted by Goodwin's appellate counsel in the course of preparing this appeal.[3] The first piece of allegedly newly discovered evidence is evidence that Senator Hatch had helped Goodwin and Keith Brown form Terrauto, Inc. in the early 1970's and that

Hatch was an officer and director of Terrauto in 1972–1973. Goodwin asserts that this new evidence corroborates her testimony at trial that she and Senator Hatch had formed Terrauto, and that the evidence is material because the government implied at trial that Hatch had nothing to do with Terrauto. We disagree. To begin with, we do not find anything in the record supporting Goodwin's assertion that the government implied that Hatch had nothing to do with Terrauto. More importantly, we see no reason why this evidence could not have been discovered earlier through the exercise of due diligence. The government introduced at trial a certification by the Nevada Secretary of State that Terrauto, Inc. had been formed in 1972 and that its charter had been revoked in 1974. By referring to documents on file with the Secretary of State, it would have been a relatively simple matter to find out who had incorporated Terrauto and who its officers and directors were during those few years, as appellate counsel has now managed to do by mail and telephone. We therefore do not believe that this evidence could not have been discovered sooner through the exercise of due diligence.

We also do not believe that the new evidence concerning Senator Hatch's role in Terrauto is material, since the jury was aware that Terrauto, Inc. did exist between 1972 and 1974 and that Senator Hatch had performed legal services for Goodwin at around that time in connection with a business venture of hers. But even if the evidence was material, newly discovered, and could not have been found sooner

---

**2.** Goodwin urges us to use the more lenient standard enunciated in *Larrison v. United States,* 24 F.2d 82 (7th Cir.1928), which is used when the court is "reasonably well satisfied" that the testimony given by a material witness is false. *Id.* at 87–88. Because there has been no showing of false or perjured testimony in this case, we reject Goodwin's suggestion that we evaluate her motion for a new trial under the *Larrison* test.

**3.** Although Goodwin's direct appeal was pending at the time of her motion for a new trial, the district court had jurisdiction to entertain the

motion. It is settled that a district court may consider a motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure during the pendency of an appeal and can either deny the motion to the court of appeals, which could then entertain a motion to remand the case. *See United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 2051 n. 42, 80 L.Ed.2d 657 (1984); *United States v. Ellison,* 557 F.2d 128, 131–32 (7th Cir.), *cert. denied,* 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 450 (1977); *Garcia v. Regents of the Univ. of Cal.,* 737 F.2d 889, 890 (10th Cir.1984).

through the exercise of due diligence, we would affirm the district court's denial of the motion for a new trial because we believe that this evidence would not lead to an acquittal in the event of a new trial. Although it certainly makes Goodwin's testimony a bit more credible, we do not believe that it makes her testimony so much more credible that it would probably lead to her acquittal in light of her false representations to the Tills and Alexanders (1) that she was still doing business as Terrauto, Inc. in 1981–1982 when in fact the corporation ceased to exist in 1974, and (2) that Senator Hatch was helping her to obtain export licenses for the mobile hospital venture in 1981–1982 when in fact she had had no contact with him since 1975. We therefore believe that the evidence that Senator Hatch was an officer and director of Terrauto in 1972–1973 would not lead to Goodwin's acquittal in the event of a new trial.

The other evidence discovered by Goodwin's appellate counsel also corroborated statements made by Goodwin at trial. The first was that two companies, Misco and RAM Industries, actually existed and had been involved in Goodwin's marketing efforts in the mid-1970's. The two companies, however, had gone defunct sometime before 1976. The second was that Graham Jeambey was an officer of Misco and RAM Industries, had dealt with Goodwin in the mid-1970's concerning her effort to design mobile hospital units, and had contacted various suppliers for Goodwin, including International Harvester and possibly General Electric.

We believe that this evidence also provides inadequate support for Goodwin's new trial motion. Again, there is no reason this evidence could not have been discovered sooner through the exercise of due diligence. Although it may have been material insofar as it corroborated a small part of what Goodwin told the Tills and Alexanders, we do not believe that it would probably result in Goodwin's acquittal in the event of a new trial. The government never denied that these companies and Mr. Jaembey existed. The relevance to a jury that they actually existed, when there was never any evidence that they did not, is somewhat questionable in light of the elaborate representations that Goodwin had made to the Tills and Alexanders that were shown to be untrue: that Lutfallah had given her rings worth thousands of dollars, that Lutfallah had given her $800,000 as a small advance on the millions that they would soon be making, that she had put the money in a local bank account but could not reach it because the IRS had frozen the funds, that her attorney had been travelling to Switzerland on her behalf, that she had flown to Saudi Arabia in a private jet to sign papers, and that General Electric was tapping her phones and spying on her in an attempt to pressure her into selling her business to them, to name a few.

In sum, we do not believe that any of Goodwin's newly discovered evidence would probably lead to her acquittal. We therefore find no abuse of discretion in the trial court's denial of Goodwin's motion for a new trial on the basis of newly discovered evidence.

### III.

In conclusion, Goodwin's conviction for wire fraud and interstate transportation of securities and money taken by fraud is AFFIRMED.[4]

---

**4.** Goodwin asserted for the first time in her reply brief, as grounds for reversal, the incompetency of her trial counsel. The government filed a motion to strike that part of Goodwin's reply brief under our Circuit Rule 9(e), which provides that a reply brief "shall be limited to matter in reply." Goodwin opposed the motion to strike, arguing that the government had implicitly raised the issue in its brief when it relied upon certain actions and inactions by Goodwin's trial counsel in supporting its assertions.

We reserved our ruling on the government's motion to strike this portion of Goodwin's reply brief, and now grant the motion.

Nothing in the government's brief implied that Goodwin's trial counsel was incompetent. Goodwin argues that the government raised the issue of her counsel's incompetence when, *inter alia*, it cited his failure to seek a continuance before Goodwin took the stand as support for the assertion that Goodwin was already prepared to testify. Although this could suggest

that he was incompetent, it could equally suggest that he was competent and had already prepared his witness. The other examples cited by Goodwin are equally without merit. We therefore grant the government's motion to strike this argument from Goodwin's reply brief.

The issue of the competency of Goodwin's trial counsel could not be presented on appeal in any event, moreover, because this argument was not presented to the trial court. *See United States v. Nero*, 733 F.2d 1197, 1207 (7th Cir. 1984) (issue of ineffectiveness of counsel will not be addressed on appeal if not presented before district court). The record is not sufficiently developed in this case to permit us, despite this general rule, to evaluate Goodwin's claim. We would therefore decline to address this argument on appeal even if it had been raised in Goodwin's opening brief rather than in her reply brief.