[Cite as *State v. Campbell*, 2017-Ohio-5665.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                    CASE NO.  1-16-56

    v.

JAYLEN L. CAMPBELL,                       O P I N I O N

    DEFENDANT-APPELLANT.


Appeal from Lima Municipal Court

Trial Court No. 16 CRB 03031

Judgment Reversed and Cause Remanded

Date of Decision:   July 3, 2017


APPEARANCES:

    *Michael J. Short* **for Appellant**

    *John R. Payne* **for Appellee**

**ZIMMERMAN, J.,**

{¶1} Defendant-appellant, Jaylen Campbell ("Campbell") appeals the November 29, 2016 judgment of the Lima Municipal Court sentencing him to 180 days in jail, with 150 days suspended, and two years of probation after Campbell was found guilty of Domestic Violence in violation of R.C. 2919.25(A), a misdemeanor of the first degree.

### Facts and Procedural History

{¶2} On October 7, 2016, Campbell was charged with Domestic Violence, a misdemeanor of the first degree, in the Lima Municipal Court. The charge stems from the allegation that Campbell assaulted Jovelie Nelson ("Nelson"), his girlfriend and the mother of his children, on October 5, 2016. Campbell pled not guilty to the charge.

{¶3} On November 28, 2016 the case proceeded to a bench trial.[1] At trial the State called four (4) witnesses: Nelson; Laquitha Robinson ("Robinson"), the 911 caller of the incident; and two Lima Police officers, Patrolman Matt Boss ("Boss") and Patrolman Nathan Fried ("Fried").

{¶4} After the State rested its case in chief, Campbell requested the charge be dismissed pursuant to Crim.R. 29, which the trial court denied. And, after being

---

[1] The record does not contain either a written waiver of Campbell's right to a jury trial or an on-the-record waiver by Campbell of such right.

admonished by the trial judge of the potential negative consequences of testifying, Campbell did not testify and thereafter presented no defense.

{¶5} Campbell was found guilty of Domestic Violence and sentenced to 180 days in jail, with 150 days suspended, and two years of probation. It is from this conviction that Campbell appeals, presenting the following two assignments of error for our review.

*Assignment of Error No. I*

**THE CONVICTIONS [SIC] ARE NOT SUPPORTED BY THE WEIGHT OF THE EVIDENCE.**

*Assignment of Error No. II*

**THE TRIAL COURT DENIED THE DEFENDANT HIS CONSTITUTIONAL RIGHT TO TESTIFY IN [SIC] HIS OWN BEHALF, THUS DENYING HIM A FAIR TRIAL**

{¶6} For the reasons that follow, we reverse the judgment of the Lima Municipal Court and remand this matter to the trial court for a new trial.

*First Assignment of Error*

{¶7} In Campbell's first assignment of error, he argues that the conviction of Domestic Violence is not supported by the weight of the evidence. We disagree.

*Standard of Review*

{¶8} In order for us to reverse a judgment on the basis that a verdict is against the weight of the evidence, we must disagree with the trial court's findings of any conflicting testimony. *State v. Thompkins*, 78 Ohio St.3d 380, 389. In reviewing

whether the trial court's judgment was against the weight of the evidence, the appellate court sits as the "thirteenth juror" and examines the conflicting testimony. *Id*. at 387. In taking on this role, this court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether, in reviewing the evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *Id*. In making this analysis, we must be mindful that determinations of credibility and weight of the testimony remain within the jurisdiction of the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 (1967), paragraph one of the syllabus.

{¶9} When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction', should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶119.

{¶10} "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends

on its effect in inducing belief.' " (Emphasis omitted.) *Thompkins*, quoting Black's Law Dictionary, at 1594 (6th Ed.1990).

*State's Case*

**{¶11}** The order of the witnesses called by the State was Nelson first, then Officer Boss, followed by Robinson and ending with Officer Fried. But in an effort to put the evidence in a better chronology of the factual events of the case, we choose to discuss the evidence starting with the testimony of Robinson, the 911 caller.

**{¶12}** Robinson started her testimony by stating (that) she did not want to testify and only appeared in court because she was subpoenaed. (Tr. 24). Therefore, the State requested that Robinson be treated as a hostile witness, which the trial court approved. (Tr. 24). Thereafter, Robinson testified as follows as to her 911 call on October 5th:

> **Q. Ms. Robinson you called the police on October 5th of 2016 didn't you?**
> **A. Yes.**
> **Q. Because your upstairs neighbors were fighting?**
> **A. Because I heard screamin' on the back… out on my back door.**
> **Q. And when you called the police you told the police that you saw the defendant stomping on your female neighbor's head didn't you?**
> **A. I did not see him. No.**
> **Q. You never saw him?**
> **A. No. I did not see his face. No. I told them that [sic] were people upstairs fighting… umm… someone was screaming … and she had stopped screamin'.**
> **Q. You never told the police that you saw them downstairs?**
> **A. No**

> **Q. You never told the police that you saw him drag her upstairs by her hair?**
>
> **A. No. I never told them [sic] drag him upstairs. I told the police that when I came out my back door there was someone upstairs screamin' there was two people upstairs fighting… he kicked her in the face and then dragged her into the apartment.**
>
> **Q. You told the police that you did see him kick her in the face?**
>
> **A. I told the police that they were up the stairs fighting and yes, she got kicked in the face.**
>
> **Q. So you were able to see that?**
>
> **A. Yes.**

(Tr. 24-25).

{¶13} On cross-examination, Robinson stated she was not able to see who was fighting; and that she never saw a foot actually connecting to the victim's face. (Tr. 27-28). And as to identifying Campbell in open court as the perpetrator of the assault, Robinson testified as follows:

> **Q. Ok. So… when you're saying you saw people outside are we talkin' about like on a landing of the steps … on the steps?**
>
> **A. Yeah. Upstairs on the landing and I couldn't see who it was it's just the way the landing is upstairs is there's… pieces of… plywood it's just like… like little bitty slits.**
>
> **Q. Ok. So it's not like a clear unobstructed view but yo… [sic]**
>
> **A. Yeah. No. I could only see through the slits…**
>
> **\* \* \***
>
> **Q. So you see through the slits you're seeing som [sic] something going on?**
>
> **A. Yes.**
>
> **Q. Movement, something?**
>
> **A. Yes.**
>
> **Q. You couldn't tell male female?**
>
> **A. No.**

-6-

\* \* \*

> **Q. You know the gentleman seated next to me at all?**
> **A. No.**
> **Q. Did you ever see him on the night of October 5th?**
> **A. No.**

(Tr. 26-27). Additionally, Robinson was not able to identify Nelson in open court as the female victim she witnessed involved in the fight outside of her home. (Tr. 29). However, during her re-direct examination, Robinson's testimony does reveal that she saw a person drag another person by their hair into the upstairs apartment, as opposed to "up the stairs" and into the apartment. (Tr. 28, 30).

{¶14} Nelson, the person whom the State alleged to be the victim in this case, testified that Campbell is her boyfriend and the father of her children but does not reside with her. (Tr. 3). Nelson testified that on October 5, 2016 officers from the Lima Police Department arrived at her residence, but that she did not call (them) for assistance. (*Id.*) She testified that after the officers arrived at her home she would not answer the door and called the Lima police department to inquire as to why the police were at her home. (Tr. 4). Nelson testified as follows in regards to her interaction with the police:

> **Q. (Prosecuting attorney)     Do you remember on October 5, having the police called to your residence?**
> **A. (Nelson)     The police was called, but I didn't call them.**
> **Q. I didn't say you called them, but you remember them showing up at your residence?**
> **A. Yeah.**

> Q. And do you remember at that point and [sic] time not wanting to talk to law enforcement officers?
> A. Yeah because I didn't call them.
> Q. And you remember them not having … you're [sic] not letting them in to your apartment?
> A. Yes, that's when I called in the police station to ask why they were here.
> Q. And was your boyfriend at your apartment at that time?
> A. Yeah.
> Q. The father of your children?
> A. Yep.
>
> * * *
>
> Q. And you told the officers that there had not been any type of fight between the two of you?
> A. Yep.
> Q. No physical altercation?
> A. No physical.
> Q. But you wouldn't let the officers check your body for injuries would you?
> A. No.
>
> * * *
>
> Q. And is your testimony that absolutely no physical altercation took place that day?
> A. Yes.

(Tr. 4-5).

{¶15} Nelson's entire testimony encompassed only five pages in the trial transcript, and thus, we find that the majority of her testimony involved her denial of being involved in a physical altercation with anyone and that she suffered no injury. However, Nelson did admit to police that she and Campbell had an argument and (that), at some point, she injured her knee. (Tr. 17).

{¶16} Lima Police Officer Boss testified that on October 5, 2016 he and other police officers responded to a 911 call in reference to a fight, wherein a male subject was assaulting a female. (Tr. 9). Boss stated that when he arrived at the residence he first made contact with Robinson, the person reporting the assault. (Tr. 11). Boss testified that Robinson advised officers (Boss and Fried) that she saw a female laying on the ground and saw a male "stomp on her" several times before dragging her up the stairs to an apartment. (Tr. 9). According to Boss, Robinson's only description of the participants in the fight were a "male and female" (Tr. 9). After speaking with Robinson, Boss proceeded to the upstairs apartment, located on the second floor of Robinson's residence, to investigate further.

{¶17} Boss testified that the occupant of the upstairs apartment, later identified as Nelson, would not answer the door to speak with officers. State's Exhibit A, the bodycam audio recording of the incident admitted into evidence, contains the following conversation between officers and Nelson at this time:

> **Officer:** **Ma'am we have to go in there (her apartment) to check your welfare.**
> **Nelson:** **No you don't. You come back with a warrant and you can come in.**
> **Officer:** **I have reason to believe that maybe your boyfriend has a gun to one of your kids' heads.** (Exhibit A, recording of car 18, at 8:02:42).

{¶18} After hearing this, Nelson complied with officers and opened her door and told officers "I'm good". (Exhibit A, recording of car 18, at 8:02:42).

**{¶19}** When questioned further, Boss testified as follow about the incident:

**Q. What did you learn upon speaking with the female?**
**A. Umm she denied the incident. Umm other officers…I learned from other officers that had spoken to the children that they stated.. [sic] I forget their exact words.. [sic] but mommy and daddy were fighting. Umm we took her out of handcuffs while speaking with her she stated that her knees were bleeding from the incident but refused to show us the injuries that she claimed to have sustained.**
**Q. So the victim admitted to you that she'd received injuries but would not allow you to examine her?**
**A. Correct.**
**Q. Did she continue to say that there was no altercation between herself and the defendant?**
**A. She appeared uh yes, she continued to deny it but her demeanor was that one [sic] of being scared and fearful that if she said something umm she would be retaliated against.**

(Tr. 17).

**{¶20}** Lima Police Officer Fried was the fourth and final witness to testify for the State. He testified that on October 5, 2016 he responded to a 911 call that "a lady outside an apartment was being assaulted by a male". (Tr. 33).

**{¶21}** Fried identified Exhibit A, the officers' bodycam audio recording of the incident, which was admitted into evidence. Exhibit A provides audio of Nelson telling officers that "he already left" (Tr. 35), but fails to reveal who "he" is.

**{¶22}** On cross-examination, Fried testified that Robinson did not identify Nelson or Campbell as being "the people outside" involved in the fight. (Tr. 39). Robinson was only able to identify the suspect and victim as a "black male and black female". Robinson gave no other distinguishing features or clothing

identification to the police to help identify the participants in the assault, only that the people involved in the altercation were black. (Tr. 39).

{¶23} At this point the State rested and the defense requested a dismissal of the case under Crim.R. 29, which the trial court denied. Thereafter, the defendant chose not to testify and presented no defense. In finding Campbell guilty, the trial court made the following findings as to the evidence:

> **Ok. Taking uh the evidence into consideration… I did believe uh based upon the evidence of the officers that they were on scene shortly after the phone call was made by the person downstairs. Umm… [sic] when they arrived… this is where it gets a little dicey did they talk to the victim… the witness first… did they go upstairs to talk to the the [sic] victim? Umm [sic] but in any event they did go and and [sic] try to make contact with the victim in this case and no one would answer the door. Umm [sic] you can hear that on the State's Exhibit "A". Continuous knocking… umm [sic] no one answered. Umm [sic] obviously the victim did not want the assistance of law enforcement. Umm [sic] what's interesting is the victim herself kept saying he didn't do anything, he didn't do anything… so in referring to you. You didn't do anything, you didn't do anything. That points to you. She was trying to defend you because she didn't want law enforcement involved.**
>
> **\* \* \***
>
> **Sir. Stop. So… and there was no explanation… she didn't say someone else was outside… there was no indication anyone was outside… umm [sic] and the [sic] interestingly enough… the third party witness who did not want to be here, and did not want to give details, and did everything in her power not to give details that would convict you sir… did say again and again about the physical altercation, the victim being on the ground, screaming and a loud argument… and… pulling her or dragging her back in the apartment and pulling her by the hair… all is the same**

**thing. That never changed. Because of that I find that the State proved their case beyond a reasonable doubt.**

*Analysis*

**{¶24}** The elements of the charge of domestic violence under R.C. 2919.25(A) are as follows:

**No person**
**Shall knowingly cause or attempt to cause**
**Physical harm**
**To a family or household member**

Thus, in order for Campbell's conviction to stand the State was required to present evidence on each of the above elements.

**{¶25}** In support of Campbell's conviction for domestic violence, the State presented the testimony of only four (4) witnesses, namely: 1) Robinson, the 911 caller; 2) Nelson, the "victim"; and 3) Boss and 4) Fried, the responding police officers. From their testimonies it is evident that a black male and black female were engaged in some sort of altercation outside of Robinson's residence. Clearly, even though she could not identify the individuals in the fight, Robinson was able to direct police to the residence where the "male and female" entered after the assault occurred, which was "up the stairs" from Robinson's residence. Boss and Fried were on the scene timely and commenced their investigation with direction from Robinson to the upstairs apartment. Once there, the officers found Campbell

and Nelson in the apartment, who matched the broad description relayed by Robinson.

{¶26} Boss and Fried did not see any sign of a physical injury to Nelson, but did testify (that) Nelson admitted to having an argument with Campbell and to having an injury to her knee.

{¶27} In our review of the record we agree with the trial court that the police officers were on the scene promptly after the 911 call and that an argument of some degree took place between the individuals occupying the apartment up the stairs from Robinson's residence. Since both Nelson and Campbell were located in the apartment and matched the general description that Robinson gave police, the trial court could reasonably infer that Campbell and Nelson could have been involved in some type of altercation that police needed to investigate. And, upon Nelson's admission to police that she and Campbell were arguing and (that) she injured her knee, the trial court could reasonably infer that they were the individuals involved in the fight witnessed by Robinson and, at the very least, Campbell had attempted to cause physical harm to Nelson in such fight.

{¶28} Lastly, it is without dispute that Campbell and Nelson are family members based upon Nelson's admission that Campbell is the father of her children.

**{¶29}** Thus, while the evidence may be somewhat dubious due to the lack of noticeable injury to Nelson and the lack of a positive identification of Campbell, we cannot say the evidence presented by the State "weighs heavily against conviction".

**{¶30}** Accordingly, appellant's first assignment of error is overruled.

### *Second Assignment of Error*

**{¶31}** In his second assignment of error, Campbell asserts that he was denied due process of law by virtue of the trial court's advisement of the potential negative consequences should he testify in his defense. In other words, Campbell argues the trial court talked him out of testifying at trial.

**{¶32}** We are cognizant that the Due Process Clause of the United States Constitution entitles a criminal defendant to an impartial and disinterested tribunal. *Cleveland v. Shaffer*, 112 Ohio App.3d 631 (1996), *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980). The neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts of law." *Id.*, at 242.

**{¶33}** Further, "the defendant's right to testify is regarded both as a fundamental and a personal right that is waivable only by an accused." *State v. Bey*, 85 Ohio St.3d 487, citing *Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37, (1987); *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 3312, 77 L.Ed.2d 987, 993, (1983). "But in Ohio, courts of appeals have held that a trial judge is not

required to conduct an inquiry with the defendant about the decision whether to testify." *Bey*, *supra*, citing *State v. Oliver*, 101 Ohio App.3d 587 (1995). "In fact, most courts have ruled that neither the United State Constitution nor applicable rules require the trial judge to ask the defendant about the decision not to testify." *Bey*, citing *Brown v. Artuz*, 124 F.3d 73, at 78; *State v. Walen*, 563 N.W.2d 742, (1997); *State v. Gulbrandson*, 184 Ariz. 46, 64, 906 P.2d 579, 597, (1995); *Phillips v. State*, 105 Nev. 631, 632-633, 782 P.2d 381, 382, (1989); *Aragon v. State*, 114 Idaho 758, 762-763, 760 P.2d 1174, 1178-1179, (1988); *Commonwealth v. Hennesey*, 23 Mass.App.Ct. 384, 387-90, (1987). "We agree and hold that a trial court is not *required* to conduct an inquiry with the defendant concerning the decision whether to testify in his defense." *Bey*, *supra*.

{¶34} "Reasons vary for rejecting the requirement. Such an inquiry is thought to be simply unnecessary. Alternatively, it may be thought harmful. As Chief Justice Erickson of the Colorado Supreme Court noted, an inquiry 'unduly interfere[s] with the attorney-client relationship' ". *Bey*, citing *People v. Curtis*, 681 P.2d 504, 519 (1984). "An inquiry 'places the judge between the lawyer and his client and can produce confusion as well as delay' ". *Bey*, citing *Underwood v. Clark*, 939 F.2d 473, 476 (1991). "For example, questioning can lead into the judge's evaluation of the wisdom of the defendant's decision, the substance of the testimony, or simply evoke a dramatic change in a previously carefully considered

trial strategy." *Bey*, citing *United States v. Goodwin*, 770 F.2d 631, 636 (4985).

"Whether the defendant is to testify is an important tactical decision as well as a

matter of constitutional right." *Bey*, quoting *Brooks v. Tennessee*, 406 U.S. 605,

612, 92 S.Ct. 1891, 32 L.Ed.2d 358, 364, (1972).

{¶35} With this being said, the trial court inquired of Campbell, *after he was

called as a witness*, as follows:

| | |
|---|---|
| **DEFENSE ATTORNEY:** | **Ok.  Uh if I could have just one second to talk to my client:** |
| **TRIAL COURT:** | **Mhmm.** |
| **DEFENSE ATTORNEY:** | **Ok your Honor uh at this time would call the defendant Mr. Campbell.** |
| **TRIAL COURT:** | **Ok.  Mr. Campbell before you get up there I'm gonna … I'm gonna admonish you … I know Mr. Chamberlain just did but I need to do that as well.  You have the uh right to remain silent, you don't have to testify … umm … in this matter at all. The burden's [sic] on the state.  Umm … if you do decide to testify as Mr. Chamberlain indicated you will be subject to cross examination, you will be placed under oath and you're gonna have to answer the questions as asked.  Even questions you may not wanna answer.** |
| **DEFENDANT:** | **Ok.** |
| **TRIAL COURT:** | **Even questions that might support a guilty finding … you would have to** |

|  |  |
|---|---|
|  | **answer. Ok? Umm … I've been doing this for quite a while and I can tell you … on a number of occasions, many occasions, a witness or a defendant will take the stand and actually provide information that is not favorable …** |
| **DEFENDANT:** | **I'm nervous now but …** |
| **TRIAL COURT:** | **I'm just, I'm just telling you that that [sic] many times they will provide information that's not favorable, so you've gotta take this …** |
| **DEFENDANT:** | **(Interrupting) I didn't do … I didn't do anything.** |
| **TRIAL COURT:** | **Sir, I'm just telling you. That that's what's happened. I'm not saying you're going to do that, but there is a possibility.** |
| **DEFENSE ATTORNEY:** | **Your Honor … On the court's admonishment he's declining.** |
| **TRIAL COURT:** | **Ok.** |
| **DEFENSE ATTORNEY:** | **… to testify so the defense has no uh witnesses to present and we would rest I guess (unintelligible) re-statement of Rule 29 motion at this time.** |

(Tr. 40-41).

{¶36} It is evident to us that the trial court's admonishment of Campbell was

not necessary and resulted in Campbell changing his mind to testify. Albeit, the

-17-

trial court may have provided Campbell insight as to why he shouldn't testify, the inquiry placed the trial court in conflict with Campbell and his lawyer's initial decision for Campbell to testify. *Assuming arguendo* that Campbell had chosen *not* to testify and the trial court then inquired (of Campbell) to determine whether his decision (not to testify) was properly thought through, our decision would be different. However, such is not the case as Campbell *changed his decision to testify* because of the trial court's advisement. Thus, we find the trial court influenced Campbell's decision to waive his right to testify due to its advisement.

**{¶37}** Accordingly, we reverse the conviction of the appellant and remand this matter to the trial court for a new trial.

**{¶38}** Having found no error prejudicial to Campbell in his first assignment of error, but finding error in Campbell's second assignment of error, the first assignment of error is overruled and the second assignment of error is sustained. The judgment of the Lima Municipal Court is therefore reversed and this matter is remanded to the trial court for a new trial.

*Judgment Reversed and*
*Cause Remanded*

**PRESTON, P.J. and SHAW, J., concur.**

**/jlr**