STATE of Minnesota, Respondent,

v.

Brett Randall WALEN, Appellant.

Nos. C6–95–1786, C6–96–1281.

Supreme Court of Minnesota.

May 29, 1997.

Thomas M. Brudvig, Roseville, for Appellant.

Hubert H. Humphrey, III, Minnesota Attorney General, John B. Galus, Assistant Attorney General, St. Paul, Jeffrey D. Thompson, Rice County Attorney, Fairbault, for Respondent.

## OPINION

TOMLJANOVICH, Justice.

A jury on May 23, 1995 convicted appellant Brett Randall Walen of the first-degree murder of Keith Eugene Wallace, Jr. Walen filed a notice of appeal on August 21, 1995 arguing only that the evidence adduced at trial was insufficient as a matter of law to sustain his conviction. Walen subsequently requested postconviction relief on two additional grounds—denial of his right to testify and ineffective assistance of counsel—and moved this court to stay the direct appeal. While awaiting this court's decisions, Walen filed a supplemental brief on the direct appeal asserting that the trial court abused its discretion by admitting autopsy photographs and a crime-scene videotape, by allowing a handgun-firing demonstration, and by denying Walen's motion for a change of venue.[1]

We granted the motion to stay the direct appeal pending the postconviction hearing. Following the one-day hearing, the district court denied Walen's requests for postconviction relief. Walen subsequently filed with this court an appeal of the order denying postconviction relief, basing it on two independent grounds: 1) that the district court erred in refusing to find that defense counsel had denied Walen his right to testify; and 2) that the district court erred in finding that Walen had waived his attorney-client privilege by claiming ineffective assistance of counsel. We consolidated the two appeals and considered each of Walen's claims. We now conclude that the district court did not abuse its discretion by denying Walen's motion for a change of venue, by admitting autopsy photographs and a crime-scene videotape, or by allowing a handgun-firing demonstration. We also hold that there was sufficient evidence for a reasonable jury to conclude beyond a reasonable doubt that Walen shot and killed Wallace. Finally, we hold that the postconviction court did not err in refusing to find that defense counsel had denied Walen's right to testify or in finding that Walen had waived his attorney-client privilege by claiming ineffective assistance of counsel. Consequently, we affirm the conviction.

The only confirmed eyewitness of the shooting was the victim's wife, Michelle Wallace, who gave the following account to police:

On Friday, August 27, 1993, Michelle and Keith Wallace left their infant daughter with Michelle's parents in New Prague and went to Faribault for a movie. Following the movie, which ended at approximately 11:30 p.m., Michelle and Keith went to the Country Kitchen restaurant in Faribault. After the meal, Keith and Michelle climbed into Keith's pickup truck at approximately midnight and began the trip back to New Prague. While traveling north on I–35, a vehicle pulled behind Keith's pickup and flashed its lights on and off several times. After traveling another mile or so, Keith drove his truck up the exit ramp to County Road 1, turned the truck right, or eastbound, on County Road 1, and pulled over to the shoulder of the road. The other vehicle followed and stopped behind Keith's truck. Keith rolled down his window and shortly thereafter Michelle said she heard a voice tell the couple to lean forward and "give me your money." Keith leaned forward and looked at Michelle to his right. Immediately thereafter, Michelle heard a "pop." Although Michelle said she

1. Walen also asserted in his supplemental brief that his right to testify had been impermissibly impeded and that the evidence submitted at trial was insufficient to sustain his conviction.

did not think the sound was a shot, she opened the passenger door and rolled out of the truck and into a ditch. She then heard another pop as the glass in the window on the passenger door shattered. Michelle later told police she saw neither the perpetrator nor the perpetrator's vehicle as the perpetrator drove away. Michelle then noticed Keith's truck rolling forward. At first she thought he was leaving the scene, but then the truck rolled down into the ditch, stopping only after going through a fence.

Moments later, Michelle saw a white Taurus traveling eastbound on County Road 1. She flagged down the car and informed the two female occupants that someone had shot her husband. Michelle asked the women to take her with them, but they refused and told Michelle they would stop and call for help, which they did at a farmhouse approximately a half mile farther east on County Road 1. Immediately after the Taurus left the scene, Michelle noticed a blue pickup truck approaching from the east on County Road 1. She once again flagged down the vehicle and told the lone male driver that someone had shot her husband and that she needed help. The driver stopped, phoned 911 from his cellular phone, left his truck and went down to check Keith's pulse. The police arrived at the scene moments later.

Once at the scene, the police found Keith's truck in the ditch with both doors closed, the driver's side window open, the passenger side window shattered, the engine, flashers and headlights on, the radio off and the manual transmission in neutral. In addition, the police found Keith dead from a gunshot wound to the back of the head. He was sitting behind the steering wheel with his head slumped against the door, his seat belt off and his glasses on the dash. After local investigators arrived, they asked for assistance from the Bureau of Criminal Apprehension ("BCA"). The BCA mobile crime lab personnel arrived a few hours later, collected evidence and photographed, videotaped, and diagrammed the scene. The police failed to examine for fingerprints on the inside of the truck and a wallet that was later discovered at the scene.

In addition to speaking with Michelle and the witnesses who stopped at the scene shortly after the shooting, police also spoke with a female motorist who had been traveling northbound on I–35 and had stopped just north of the County Road 1 exit at approximately 12:30 a.m. The witness said she heard what sounded like a truck or car backfiring shortly after she pulled off the road after striking a deer with her car. From where she had stopped she could see a vehicle's headlights facing eastbound up on County Road 1. She said that shortly after hearing the sound, the headlights moved and then fell out of sight. Police later discovered another witness who was east of the crime scene shortly after the shooting. The witness said he observed a maroon colored mid–1980's Oldsmobile-type car driving eastbound on County Road 1, however, a police officer who was driving westbound toward the scene over that same stretch of road reported seeing no such vehicle.

The police became suspicious of Walen when Michelle Wallace's brother, Mark Schadegg, called them on Sunday, August 29, 1993. At a meeting on Monday, August 30, 1993, Schadegg, along with his fiance Pam Brytenson, told the police that Michelle had been seeing Walen romantically and that Keith had become aware of the relationship. This information conflicted with the statement Michelle gave on the night of the shooting. The police obtained Michelle's phone records and discovered hundreds of minutes of long distance phone charges between Michelle's and Walen's respective residences. These calls began in October 1992 and continued through the investigation. The police later obtained a wiretap warrant for Walen's phones and began intercepting calls on November 29, 1993. The trial court suppressed the evidence adduced from those wiretaps because Walen was not notified of the wiretap within the statutorily specified period. In addition, the police had Brytenson tape record her telephone conversations with Michelle.

The police learned that Walen had applied for a gun permit on August 3, 1993. The permit was issued on August 17, 1993, and Walen on August 21, 1993 purchased for

$211.94 a .38 caliber Smith & Wesson, Model 15 revolver and one box of target shooting ammunition. Walen later purchased a box of Federal American Eagle .38 caliber ammunition from a different dealer and used some ammunition from both boxes at a shooting range. Walen gave both boxes of ammunition to his roommate prior to the shooting, and then sold the gun for $125 the morning of August 28, 1993, just hours after Keith's murder.

The police later searched Walen's home pursuant to a search warrant and discovered the permit. The police also seized Walen's 1984 red Chevrolet Cavalier automobile. Walen subsequently came to the police station for a voluntary statement, during which he denied any involvement in the shooting. He said he had worked until 9:45 p.m. on the night of the shooting and that he thought he had gone drinking with a friend, Tony Welsch. Walen said he then returned to his mother's house, where he was living at the time, and spoke with his mother from 12:30 a.m. until approximately 1:30 a.m.[2] Walen did, however, admit to having a relationship with Michelle. Walen was unaware that police had spoken with Welsch five days earlier and that Welsch had told police he was at the Lino Lakes Police Department on the night of the shooting, and not with Walen. Welsch, who was a suspect for a time, later provided police with a receipt from the Lino Lake Police Department confirming that he was there at the time of the shooting.

The police ultimately found the gun Walen had sold and tested the four bullet fragments taken from Keith Wallace's head to see if they came from the gun. A BCA firearms examiner concluded that the bullet fragments appeared to be parts of a .38 or .357 caliber bullet, but was unable to conclude whether the bullet fragments had been shot from Walen's gun or not. Consequently, the BCA sent the fragments and the gun to the Bureau of Alcohol, Tobacco, and Firearms ("ATF") for further testing. An ATF firearms expert ultimately concluded that the bullet fragments taken from the victim's head had been fired by Walen's gun. A grand jury indicted both Michelle Wallace and Walen of first-degree murder on March 25, 1994. The two received separate trials.

During pretrial proceedings, Walen filed a motion for change of venue based on the amount of pretrial publicity given to the case. The trial court denied the motion on the grounds that nothing in the news coverage presented to the court supported Walen's contention that there was a reasonable likelihood that he could not receive a fair trial. Walen made numerous objections at trial, two of which are pertinent to this appeal. First, he objected to the inclusion of autopsy photographs. Second, he objected to a handgun demonstration. The trial court partially sustained the first objection, and allowed as evidence only a handful of the autopsy photographs that the state had presented. The trial court overruled the second objection, and allowed the handgun demonstration. After an 11-day trial in Rice County, defense counsel rested without calling Walen to the stand. No record was made regarding the appellant's waiver of his right to testify. After approximately five hours of deliberation, the jury convicted Walen of first-degree murder. A Dakota County jury subsequently acquitted Michelle Wallace after her successful motion for a change of venue

The evidence at the postconviction hearing consisted of the testimony of four potential alibi witnesses, the defense attorney and Walen. In addition, Walen introduced as evidence an affidavit prepared by the defense attorney prior to the hearing. Walen contended that he received ineffective assistance of counsel because his attorney, Paul Applebaum, failed both to apprise him of his right to testify and failed to investigate and ultimately call Christina Cortez and other potential alibi witnesses. At the hearing, Cortez first testified that she and her husband were with Walen from 10 p.m. until 11:30 p.m. on the night of the shooting. But later during the hearing she admitted there was some confusion as to the date. In addition, she testified that her husband was certain that the night the couple spent with Walen was not August 27, 1993. Applebaum asserted in his affidavit that he did not call many of Walen's proposed alibi witnesses because they could

2. Walen's mother testified that her son returned home a little past midnight.

not corroborate Walen's many versions of his whereabouts on the night of murder. During his testimony, Applebaum also stated he did not call Cortez because she had implicated Walen in the murder.

In order to rebut Walen's claim that Applebaum had not adequately investigated and interviewed potential alibi witnesses, the prosecutor sought to question Applebaum concerning what Walen had told his attorney about his whereabouts on the night of the murder. Walen objected on the grounds that such information was protected by the attorney-client privilege. Following a conference in chambers, the court concluded that Walen had waived the privilege by claiming ineffective assistance of counsel. Walen subsequently withdrew the portion of his ineffective assistance-of-counsel claim that related to Applebaum's failure to call certain alibi witnesses.

With respect to Walen's claim that Applebaum did not properly apprise him of his right to testify, Walen's testimony differed sharply from Applebaum's. Walen testified that he told Applebaum more than once that he wanted to testify, but that Applebaum would not allow him to testify unless Walen agreed to use Applebaum's version of the facts. Applebaum, on the other hand, testified that it was Walen's choice not to testify. Although there was no record of Walen's waiver, the postconviction court found that it was "more likely than not" that his waiver was knowing and voluntary.

### I.

We begin our analysis with Walen's claim that the trial court erred in refusing to grant his motion for a change of venue. This court will not reverse a trial court's determination on a defense motion for change of venue unless there has been a clear abuse of discretion. *State v. Kinsky*, 348 N.W.2d 319, 323 (Minn.1984). "A motion for * * * change of venue shall be granted whenever it is determined that the dissemination of potentially prejudicial material creates a reasonable likelihood that in the absence of such relief, a fair trial cannot be had." Minn. R.Crim. P. 25.02, subd. 3. Although the rule does not require a showing of actual preju-

dice before a trial court can grant a defendant's motion, this court must find actual prejudice before granting relief on appeal. *State v. Beier*, 263 N.W.2d 622 (Minn.1978). Factual news reports alone are insufficient to establish that pretrial publicity was prejudicial. *State v. Salas*, 306 N.W.2d 832, 835 (Minn.1981).

Walen offers no evidence that the pretrial publicity in any way affected the fairness of his trial, nor any proof that he suffered actual prejudice. As a result, we hold that the trial court did not abuse its discretion in denying Walen's motion for a change of venue.

### II.

We next turn to Walen's objection regarding the trial court's admission of six pre-autopsy photographs, 19 crime-scene photographs, four of which show the victim slumped in the driver's seat of his truck, and a 6–minute videotape of the crime scene. The use of visual aids is an issue within the discretion of the trial court. *State v. Friend*, 493 N.W.2d 540, 544 (Minn.1992). Such aids are admissible if they will assist the jury in understanding the witness' testimony. *State v. DeZeler*, 230 Minn. 39, 46–47, 41 N.W.2d 313, 319 (1950); *Friend*, 493 N.W.2d at 544. Photographs of a homicide victim's body "are admissible where they are (1) accurate and (2) helpful as an aid to a verbal description of objects and conditions which are relevant to some material issue." *State v. Martin*, 261 N.W.2d 341, 344 (Minn.1977).

The crux of Walen's argument is that the photographs and videotape shown to the jury were unnecessary. As the state correctly asserts, however, a trial court need not determine that the photographs and other visual aids are necessary in order to admit them into evidence. The appropriate test regarding the admissibility of photographs and other visual aids is relevance, in other words, whether the photographs and other visual aids are helpful to the jury. *See Martin*, 261 N.W.2d at 344. Walen does not assert that the photographs or videotape are inaccurate or otherwise misleading. Nor does Walen assert that either the photo-

graphs or videotape were not helpful. The prosecution used the photographs and videotape to help clarify the coroner's testimony— testimony that was crucial to the prosecution's attempt to show that the shooting did not occur as Michelle Wallace claimed. Consequently, the trial court did not abuse its discretion in admitting the photographs or videotape.

■ We next turn to Walen's contention that the trial court abused its discretion by allowing the prosecution to fire the alleged murder weapon at a firing range in the presence of the jury. The prosecution used the demonstration to impeach the story of Michelle Wallace, who in a statement to police shortly after the shooting said the gunshot did not sound like gunfire because it was not loud enough. Walen cites no law for the proposition that the gunfire demonstration was inadmissible. It can only be surmised, therefore, that Walen is claiming either that the evidence was not relevant, *see* Minn. R. Evid. 401, or that the demonstration's unfair prejudicial nature substantially outweighed its probative value, *see* Minn. R. Evid. 403.

■ Evidence is relevant when it "logically or reasonably tends to prove or disprove a material fact in issue, or tends to make such a fact more or less probable, or affords a basis for or supports a reasonable inference or presumption regarding the existence of a material fact." *State v. Horning*, 535 N.W.2d 296, 298 (Minn.1995). Walen asserts that the demonstration had no probative value in large part because the demonstration "in no way, shape, or form recreated the conditions occurring on August 28, 1993 when Keith Wallace Jr. was shot." In addition, Walen contends that the weapon used during the demonstration was not the actual murder weapon. Neither argument is persuasive.

■ Determination of a piece of evidence's relevance and accuracy is within the discretion of the trial court and will be overturned only if clearly abused. *Johnson v. Washington County*, 518 N.W.2d 594, 601 (Minn.1994). The only witness to the crime asserted that the gunshot was not loud. It was the state's position that this witness was

lying, and that the murder did not occur exactly as the witness testified. Consequently, the gunshot demonstration was relevant to whether or not the witness was telling the truth. In addition, Walen offers no evidence for his contention that the demonstration was inaccurate or misleading. And even if this court were to adopt Walen's contention that the state had not established that the gun used during the demonstration was the actual murder weapon, the fact remains that there was sufficient evidence to show that the gun before the court was the same type of gun that was used to kill Wallace. Consequently the trial court did not abuse its discretion by concluding that the gun demonstration was relevant. *See State v. Flores*, 418 N.W.2d 150, 159–60 (Minn.1988) (allowing replica of gun for demonstrative purposes).

Even though the demonstration was relevant, the trial court could have excluded it had the court determined that the demonstration's probative value was "substantially outweighed by the danger of unfair prejudice." Minn. R. Evid. 403. As stated above, the demonstration's probative value was significant. By comparison, its danger of unfairly prejudicing the jury was remote. Walen's contention that the demonstration was used for "shock value" is conclusory and without support. In addition, Walen's claim that the sound of the handgun served only to sicken and repulse the jury to such a degree that they would "forget their true job to examine the evidence in its proper light," lacks sufficient support to show that the trial court clearly abused its discretion to allow the demonstration.

III.

■ We next turn to Walen's claim that there was insufficient evidence to support the jury verdict. "The standard of review in an insufficiency-of-evidence appeal is whether, viewing the evidence and any reasonable inferences that could be drawn therefrom in a light most favorable to the [verdict], the jury could reasonably find the defendant guilty beyond a reasonable doubt." *State v. DeWald*, 463 N.W.2d 741, 748 (Minn. 1990) (quoting *State v. Boitnott*, 443 N.W.2d

527, 531 (Minn.1989) (citation omitted)). A conviction based upon circumstantial evidence merits stricter scrutiny. *State v. Bias,* 419 N.W.2d 480, 484 (Minn.1988). Such "evidence is entitled to the same weight as any evidence so long as the circumstances proved are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of guilt." *Id.* Walen contends that more than reasonable doubt exists as to who was involved in the murder. Although this may be true, the test in our review is not whether reasonable doubt exists, but whether there was sufficient evidence for a jury to reasonably conclude beyond a reasonable doubt that Walen committed the crime. The dispositive consideration, therefore, is not whether reasonable doubt existed, but whether there was sufficient evidence for a jury to reasonably conclude that no reasonable doubt existed.

It is true that the state based its case primarily upon circumstantial evidence. Such evidence included Michelle Wallace's failure to tell police she had a relationship with Walen; hours of phone conversations between Michelle and Walen just prior to the shooting; Michelle's subsequent engagement to Walen; Michelle's status as the sole beneficiary of her husband's $120,000 life insurance policy; the hunt for a new house by Michelle and Walen; Walen's uncertainty about his whereabouts at the time of the shooting; Walen's purchase of a gun that used ammunition similar to that used to kill the victim; and Walen's sale of that gun just hours after the shooting. But it also is true that the state produced an expert witness who testified that the bullet fragments that killed the victim could have been shot only from Walen's gun. It also is true that Walen told police he alone had possession of his gun during the time of the shooting. Although Walen now asserts that earlier testimony by a BCA agent who failed to conclude that the bullet fragments had been shot from Walen's gun casts a shadow of doubt on the ATF expert's conclusions, the fact remains that it is the jury's job to determine the credibility of witnesses. Given that, and the fact that this court must view the evidence in the light most favorable to the verdict, the fact that the ATF expert testified that the bullet fragments were shot from Walen's gun is sufficient to conclude beyond a reasonable doubt that Walen committed the murder.

## IV.

 We next consider Walen's claim that the postconviction court erred by denying his claim of ineffective assistance of counsel, in part, because his trial attorney did not properly apprise him of his right to testify. Generally speaking, this court reviews a postconviction proceeding only to determine whether there is sufficient evidence to sustain the postconviction court's findings, and will disturb a postconviction court's decision only when that court abused its discretion. *Scruggs v. State,* 484 N.W.2d 21, 25 (Minn. 1992).

 In order to succeed on an ineffective assistance-of-counsel claim, a defendant must

> affirmatively prove that his counsel's representation 'fell below an objective standard of reasonableness' and 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Gates v. State,* 398 N.W.2d 558, 561 (Minn. 1987) (quoting *Strickland v. Washington,* 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674 (1984)). When the defendant proves that his attorney denied him his right to testify, however, this court will grant a new trial regardless of the probable result in a subsequent proceeding.[3] *State v. Rosillo,* 281 N.W.2d 877, 879 (Minn.1979). The question before this court, therefore, is whether Walen proved that his counsel had denied him his right to testify.

---

**3.** Stated another way, it never can be harmless error when an attorney *denies* a defendant his right to testify. *State v. Rosillo,* 281 N.W.2d 877, 879 (Minn.1979). It can be harmless error, however, when an attorney's failure to adequately inform the defendant of facts relative to his decision adversely affects the defendant's *choice* not to testify. *See Hauwiller v. State,* 295 N.W.2d 641, 643 (Minn.1980).

Minnesota recognized that the right to testify was personal and could not be waived by counsel in 1979. *Rosillo*, 281 N.W.2d at 878. Since that time, the United States Supreme Court has held that a criminal defendant has a constitutional right to testify on his or her own behalf. *Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). Although the Supreme Court has not expressly commented on the necessary requirements concerning a waiver of such a right, it generally is conceded that the waiver of the right to testify, like the waiver of many other constitutional rights, should be voluntary and knowing. *United States v. Bernloehr*, 833 F.2d 749, 751 (8th Cir.1987) (stating that "the defendant's waiver of his right to testify, like his waiver of other constitutional rights, should be made voluntarily and knowingly"); *see State v. Smith*, 299 N.W.2d 504, 506 (Minn.1980) (stating that defendant's waiver of his right to testify was given "voluntarily and intelligently").

 Walen testified during his postconviction hearing that his waiver was neither voluntary nor knowing. The trial attorney, on the other hand, testified that he fully informed Walen of his right to testify, the pros and cons of testifying, and that Walen ultimately decided not to testify. The postconviction court found that the trial attorney was telling the truth and concluded that it was "more likely than not" that Walen's waiver was knowing and voluntary. Walen contends that the "more likely than not" standard of proof does not "wash," but again, Walen's contention is without merit.[4] The petitioner at a postconviction hearing bears the burden of proving that his assistance of counsel was ineffective. *Gates v. State*, 398 N.W.2d 558, 561 (Minn.1987). Likewise, the petitioner bears the burden of proving that the waiver of his right to testify was not knowing and voluntary. *See Marhoun v. State*, 451 N.W.2d 323, 328 (Minn.1990);

*State v. Jensen*, 322 N.W.2d 608, 609–10 (Minn.1982). When the trial court record is silent as to waiver, this court "must presume that the decision not to testify was made by defendant voluntarily and intelligently." *State v. Smith*, 299 N.W.2d 504, 506 (Minn. 1980). Furthermore, it is within the postconviction court's discretion to credit the testimony of the trial counsel while discrediting the testimony of the defendant. *See Jensen*, 322 N.W.2d at 610. Consequently, the postconviction court was acting within its discretion in finding that attorney Applebaum's testimony was more credible than defendant Walen's, and ultimately concluding that it was more likely than not that Walen knowingly and voluntarily waived his right to testify.

 Walen also contends that this court should use its supervisory power to impose on trial courts the duty to perform an on-the-record colloquy with every criminal defendant who does not testify. A handful of jurisdictions have imposed such a requirement on trial courts whenever a criminal defendant does not testify. *See, e.g., Tachibana v. State*, 79 Hawai'i 226, 900 P.2d 1293 (1995); *State v. Orr*, 304 S.C. 185, 403 S.E.2d 623 (1991); *State v. Neuman*, 179 W.Va. 580, 371 S.E.2d 77 (1988); *People v. Curtis*, 681 P.2d 504 (Colo.1984); *Culberson v. State*, 412 So.2d 1184 (Miss.1982). Many other jurisdictions have strongly suggested that such a colloquy should take place. *E.g., Herdt v. State*, 891 P.2d 793 (Wyo.1995); *Boyd v. United States*, 586 A.2d 670 (D.C.1991).

Despite the positions taken by these courts, we decline to use our supervisory powers to impose such a requirement on the trial courts of this state. We take this opportunity to note, however, that placement on the record of a defendant's waiver of his right to testify often will save both the court

---

4. In his reply brief, Walen contends that this court should employ the same standard as that used in *LaVigne v. State*, 812 P.2d 217 (Alaska 1991), where the Alaska Supreme Court held that once a criminal defendant proves that counsel prevented the defendant from testifying, the burden of proving the error harmless shifted to the state. *Id.* at 220. Walen mistakenly confuses the standard of *review* with the standard of *proof*.

Unlike Alaska, which allows appellate courts to conclude that a denial of the right to testify can be harmless error, Minnesota law requires appellate courts to grant a new trial every time a defendant has been denied the right to testify. *State v. Rosillo*, 281 N.W.2d 877 (Minn.1979). By asking this court to adopt the standard used in *LaVigne*, Walen actually is asking that this court lower its standard of review.

and defense counsel considerable time at any postconviction proceeding.

## V.

Walen also claimed at the postconviction hearing that he was denied effective assistance of counsel because, in part, his attorney did not adequately investigate, interview or ultimately call potential alibi witnesses. After calling four potential alibi witnesses at the postconviction hearing, Walen called his trial attorney and questioned him at length about his conversations with Walen regarding his right to testify and potential alibi witnesses. On cross examination, the state then asked Walen's trial attorney if Walen had told the attorney where he had been at the time of the shooting. Walen objected on the grounds that such testimony was protected by the attorney-client privilege. The trial court overruled the objection on the grounds that Walen had waived his privilege by claiming ineffective assistance of counsel and by eliciting privileged information during his direct examination of his attorney. Moments later, the state asked the attorney for the substance of those conversations and Walen objected again. Once again the trial court overruled the objection on the grounds that Walen had waived the privilege. Walen then withdrew that portion of his claim based on the failure to call alibi witnesses.

The common-law attorney-client privilege is codified in Minnesota law as follows:

> An attorney cannot, without the consent of the attorney's client, be examined as to any communication made by the client to the attorney or the attorney's advice given thereon in the course of professional duty; nor can any employee of the attorney be examined as to the communication or advice, without the client's consent.

Minn.Stat. § 595.02, subd. 1(b) (1996); see also Minn. R. Prof. Conduct 1.6(a) (prohibiting attorneys from revealing any confidence or secret of a client, including all privileged information). It is undisputed that the communications testified to by the trial attorney were privileged. The only issue before us is whether the client waived this privilege either by bringing his claim for ineffective assistance of counsel or by subsequently examining the attorney about privileged communications—and if the client did waive the privilege, the appropriate scope of that waiver.

A client can waive his or her attorney-client privilege either by explicit consent or by implication. See generally 8 Wigmore, Evidence § 2327 (McNaughton rev.1961). One type of implicit waiver occurs when the client "alleges a breach of duty to him by the attorney." Id. at 638. Such a waiver is contemplated in the Minnesota Rules of Professional Conduct, which allow an attorney to reveal confidences and secrets when necessary "to defend the lawyer or employees or associates against an accusation of wrongful conduct." Rule 1.6(b)(5), MRPC. Although Walen concedes the implications of Rule 1.6(b)(5), he contends—without any legal support—that his claim for ineffective assistance of counsel was not an accusation of wrongful conduct.

Although no Minnesota case is directly on point, many other jurisdictions have concluded that ineffective assistance-of-counsel claims, or similar postconviction claims, necessarily waive the attorney-client privilege as to all communications relevant to that issue. Tasby v. United States, 504 F.2d 332, 336 (8th Cir.1974) (stating that "[w]hen a client calls into public question the competence of his attorney, the privilege is waived"); Laughner v. United States, 373 F.2d 326, 327 (5th Cir.1967) (holding that a claim for ineffective assistance of counsel waives attorney-client privilege); In re Gray, 123 Cal.App.3d 614, 176 Cal.Rptr. 721 (1981) (stating there is no attorney-client privilege in habeas corpus proceeding); State v. Kruchten, 101 Ariz. 186, 417 P.2d 510 (1966) (finding that a party waived his privilege by asserting in a postconviction proceeding that his counsel was incompetent); Everett v. Everett, 319 Mich. 475, 29 N.W.2d 919 (1947) (finding the former attorney's affidavit disclosing certain confidential communications to be admissible following the client's motion for new trial on the ground that plaintiff's former counsel was incompetent). Such a rule also is consistent with this court's reasoning in State v. Madigan, 66 Minn. 10, 68 N.W. 179 (1896),

where this court concluded that a criminal defendant waived his attorney-client privilege by claiming in a motion for a new trial that his counsel had practiced fraud upon the court.

> [W]e think [the attorney-client] privilege may be waived either by the conduct or consent of the client. Such communications are not privileged to the extent of depriving the attorney of the means of obtaining or defending his right. And we are of the opinion that, if the client voluntarily breaks the seal of privileged silence by a vicious and defamatory attack upon his attorney upon matters otherwise privileged, and makes them a part of the public judicial records of the state, the court, in the interest of justice, ought to permit the opposite party the use of the attorney's denial by counter affidavit. If the client does not wish a repulse, he should not attack.

*Id.* at 12, 68 N.W. at 180 (internal citation omitted).

Given this overwhelming precedent, we hold that a defendant who claims ineffective assistance of counsel necessarily waives the attorney-client privilege as to all communications relevant to that issue, and therefore we do not need to reach the question of whether Walen waived his attorney-client privilege either by calling his attorney to testify about confidential communications, or by testifying himself about confidential communications. *State ex rel. Schuler v. Tahash,* 278 Minn. 302, 308, 154 N.W.2d 200, 205 (1967) (stating that "[i]f the defendant himself calls the attorney for that purpose, the existence of waiver is clear"); *State v. Tall,* 43 Minn. 273, 45 N.W. 449 (1890) (stating that witness can waive attorney-client privilege by testifying to privileged communications); *see also State v. Thompson,* 306 N.W.2d 841 (Minn.1981) (concluding that disclosure of incriminating documents waived attorney-client privilege).

 The final question we must address is the scope of Walen's waiver. We must identify and allow the waiver to reach only those communications that were relevant to the issue of ineffective assistance of counsel. 8 Wigmore, Evidence § 2327 (McNaughton rev.1961). Walen argues that although he may have waived a portion of his privilege, the inquiry into his various statements relating to his whereabouts went beyond the scope of his waiver. Because the trial attorney based his decision to not call certain alibi witnesses, in part, on the uncertainty of Walen's story, Walen's argument is without merit. Walen's varied stories concerning his whereabouts provided the very basis for the attorney's decision not to call those alibi witnesses for which Walen was claiming ineffective assistance of counsel.

We hold, therefore, that the postconviction court did not abuse its discretion in concluding that the trial court did not err in ruling that Walen waived his attorney-client privilege in relation to his statements regarding his whereabouts on the night of the murder.

Affirmed.