**STATE of Minnesota, Respondent,**

v.

**Susan Rae BERKOVITZ, Appellant.**

No. A04–1722.

Supreme Court of Minnesota.

Nov. 3, 2005.

John M. Stuart, State Public Defender, Rochelle R. Winn, Assistant State Public Defender, Office of the State Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, Attorney General, St. Paul, MN, Amy Klobuchar, Hennepin County Attorney, Jean E. Burdorf, Assistant County Attorney, Minneapolis, MN, for Respondent.

OPINION

PAGE, Justice.

In September 2003, appellant Susan Rae Berkovitz shot and killed Shelley Joseph–Kordell and wounded Richard Hendrickson. On May 4, 2004, after a trial, a jury found Berkovitz guilty of first-degree premeditated murder and attempted first-degree premeditated murder. Berkovitz filed a motion for a new trial, arguing her lawyers had coerced her into not testifying at the trial. The trial court denied the motion, finding Berkovitz's lawyers gave her "strong" and "unequivocal" advice without using any "intimidating, high pressure, unduly persuasive words."

On appeal, Berkovitz argues the trial court erred in denying her motion for a new trial. Berkovitz additionally claims in her pro se supplemental brief that she was not informed of her *Miranda* rights, that the court erroneously denied her motion to change venue, and that her trial counsel provided ineffective assistance of counsel by failing to prepare her for the trial and by not submitting her request for a substitution of the trial judge. We affirm.

Testimony at trial revealed the following. Berkovitz is the youngest of three children born to Hyman and Anna Berkovitz. The couple's other two children are Sherilee Feldman and Robert Berkovitz. Hyman and Anna began living in St. Paul in 1955. In 1997, Feldman and Robert Berkovitz arranged for Feldman to assume power of attorney over Hyman's estate after Hyman began exhibiting signs of dementia. They did not inform Berkovitz because they were concerned about her reaction. In November 1997, Hyman granted Feldman the primary power of

attorney and Robert Berkovitz the secondary power of attorney.

In 1999, Hyman added a codicil to his will that increased Berkovitz's share of his estate as a secondary beneficiary from 25% to 40%. In addition to the codicil, Hyman also created a spend-down account in which money was gifted to Feldman and Robert Berkovitz to pay for some of Hyman's future expenses. Berkovitz, however, was not made aware of the spend-down account.

In May 1999, Berkovitz, who had been living with Hyman and Anna until July 1998, moved back to their house. In July 1999, Feldman and Robert Berkovitz moved Hyman and Anna into an apartment for senior citizens. Berkovitz was not informed of the move until shortly before it took place. Although informed that she could remain in the house until it was sold, Berkovitz became angry and contacted the Ramsey County Adult Protection Agency and reported that Feldman was abusing Hyman and Anna and was forcing them to move against their will. She also reported Feldman to the police. As a result, the police contacted Anna, who informed them that the move was voluntary.

At about the same time, Berkovitz learned that Hyman had granted Feldman his power of attorney. In August 2000, Berkovitz filed a petition for appointment of general conservator, seeking to become Hyman and his estate's conservator. In September 2000, Anna filed an objection to Berkovitz's conservatorship petition, stating that Berkovitz had "constantly harassed" family members and should not be granted the conservatorship. Anna subsequently requested and obtained a harassment restraining order against Berkovitz. To oppose the petition, Feldman and Robert Berkovitz hired attorney Richard Hendrickson to represent them in the proceedings. In December 2000, before Berkovitz's petition was resolved, Hendrickson notified Berkovitz that she had to vacate Hyman and Anna's house by the end of March 2001. Berkovitz refused to move, and Hendrickson filed an unlawful detainer against her. After a hearing, the district court ordered Berkovitz to vacate the house.

In June 2001, a hearing was held on Berkovitz's petition. After the hearing, the court found Hyman to be an "incapacitated person" and appointed Anna and Estates in Transition, Inc., a Minnesota corporation that provided services to elderly persons and was owned and managed by Hyman and Anna's niece, Shelley Joseph–Kordell, as co-conservators of Hyman's person. Estates in Transition was appointed as the sole conservator of Hyman's estate. In its order, the court limited Berkovitz to supervised visits with Hyman under conditions to be determined by Estates in Transition.

Angry about the outcome of the conservatorship proceedings, Berkovitz filed several unsuccessful petitions to challenge the conditions of her visitation and the management of Hyman's estate. Berkovitz focused her anger on Joseph–Kordell and Hendrickson, who had become counsel for Estates in Transition. Berkovitz subsequently made a number of unsuccessful complaints to various authorities about Joseph–Kordell and Hendrickson. As time passed, the relationship between Berkovitz and her family deteriorated to the point that, in April 2002, Anna sought another restraining order against Berkovitz.

At some point, Anna decided that she and Hyman should move to California and, in July 2002, Hyman and Anna moved to an assisted living facility in Los Angeles. When Berkovitz realized that Anna and Hyman had left Minnesota, she filed a petition to compel Hyman's return. That

petition was denied by a Minnesota district court. At the same time the court declared Berkovitz to be a frivolous litigant. As a result, the court required Berkovitz's future communication with the court and the Probate Court Administrative Office to be in writing and barred Berkovitz from entering the Probate Court Administrative Office. In January 2003, the court heard and granted Joseph–Kordell and Hendrickson's petitions to prohibit Berkovitz from directly communicating with them. The court then ordered Berkovitz to only communicate with Joseph–Kordell and Hendrickson through an attorney. In April 2003, Anna, Feldman, and Robert Berkovitz transferred Hyman's conservatorship to California, and Feldman became the conservator for Hyman's person and estate. On July 1, 2003, Hyman died at the age of 95.

On September 3, 2003, Berkovitz filed a harassment petition against Joseph–Kordell and Hendrickson, and the district court set a hearing for September 29, 2003. On the morning of the 29th, Joseph–Kordell and Hendrickson met at the Hennepin County Government Center's information desk at about 9:30 a.m. Hendrickson asked for security, and Michael Frost, an unarmed security guard at the government center, escorted Joseph–Kordell and Hendrickson to the 17th floor of the building.

After arriving at the 17th floor, Hendrickson noticed that Berkovitz was standing in the hallway outside the courtroom. After Joseph–Kordell and Hendrickson checked in with a clerk at the district court administrative office, Joseph–Kordell indicated that she needed to use the restroom and asked Frost to escort her and not let anyone into the restroom while she was using it. She told Frost that the person she was concerned with was outside the courtroom but did not specifically identify

Berkovitz. Hendrickson remained in the reception area, planning to serve Berkovitz with documents related to a pending motion to have the district court declare Berkovitz a frivolous litigant and to place further restrictions on her. As Hendrickson was kneeling to get documents from his briefcase, he heard a crack and felt as if his neck was hit by a baseball bat. Hendrickson spun around, landed on his right-hand side, and felt blood running down his shoulder. Hendrickson then saw Berkovitz walking away from him carrying a gun. Hendrickson began repeating, "My name is Richard Hendrickson, I have just been shot by Susan Berkovitz."

Frost was waiting outside of the restroom when he heard what sounded like a "firecracker." Frost looked around and saw Berkovitz walking towards him holding a gun in her right hand. Unaware that Berkovitz was connected to Joseph–Feldman and Hendrickson, Frost took cover and went to notify the sheriff's department, which was located in the building. As he did so, he saw Berkovitz walk into the restroom and he heard four shots.

Shortly after the shooting, Minneapolis Police Officer Timothy Callahan entered the restroom with two other officers and immediately noticed a gun lying on the floor. The officers then found Joseph–Kordell lying in a stall, bleeding and moaning. After the paramedics placed Joseph–Kordell on a stretcher, she told Callahan that Berkovitz had shot her. Joseph–Kordell later died at the hospital from multiple gunshot wounds. Hendrickson survived, but his left vocal cord was paralyzed.

Minneapolis Police Officer David Shotley found Berkovitz standing in a women's restroom on the other side of the government center. Officer Shotley asked Berkovitz if she was the shooter, and Berkovitz responded "yes." Berkovitz also stated that she had left the gun

in the other women's restroom. Officer Shotley later took Berkovitz into the hallway and sat her on a bench, and Berkovitz told him, "They have been taking Dad's money for the last three years." Officer Shotley informed Berkovitz that he only needed her identification information and that she could speak to investigators later.

Shortly after, the police took Berkovitz into a secure room for interrogation. While in the room, a police investigator informed Berkovitz of her *Miranda* rights, and Berkovitz stated that she would not discuss the shooting until she talked to an attorney. Later, however, Berkovitz started to volunteer information about the shooting. A police detective reminded Berkovitz that she had invoked her right to counsel and that he could not talk to her alone. Berkovitz acknowledged that she understood, but continued to talk at length about the shooting. Her statements were recorded by a video camera that was in the room. On the recording, Berkovitz stated that she "had money before all this happened." According to Berkovitz, she took care of her parents over the years, but her siblings "took everything." Berkovitz stated that she had initially trusted Joseph–Kordell, but Joseph–Kordell turned against her and worked with Feldman to steal money from the estate and that Hendrickson caused her to be evicted from her parents' house and harassed her by continuously filing cases and motions against her. Berkovitz stated that Hendrickson was "real intimidating" and that she became "really upset with what they did." Berkovitz further explained that "there was a gun show last summer and I went and I looked, and I never before handled one and I did some target practicing and I—I, um—this is—this really upset me, what they did." Berkovitz also stated that, "Well, he's not going to take Daddy's money any more, they're not."

The grand jury returned a two-count indictment against Berkovitz, charging her with the premeditated first-degree murder of Joseph–Kordell and the attempted premeditated first-degree murder of Hendrickson. The trial court appointed Assistant Hennepin County Public Defenders Diana Lugo and Daniel Homstad (collectively, trial counsel) to represent Berkovitz.

Berkovitz's trial began on April 12, 2004, and, on April 20, during voir dire, Berkovitz's trial counsel filed a motion for a competency evaluation, claiming Berkovitz lacked the ability to understand and consult with them and was incapable of participating in her defense. The district court granted the motion and a competency hearing was held. In finding Berkovitz competent to stand trial, the trial court observed that Berkovitz had spoken in court several times and had a desire to tell the jury her story. The court commented that "when you really think about it, that is just tough because the lawyers have to give her the best advice [that is, to not to testify]," but, "if she wants to take the stand and tell the story after they told her the consequence of it, then she has a right to do it."

During trial, Berkovitz met with her lawyers at least twice to discuss the possibility of her testifying. Those meetings occurred on April 17 and May 2, 2004. During both of those meetings, her lawyers advised Berkovitz that she should not testify. They made it clear to her that in their view if she did testify she would be convicted. After these two meetings, Berkovitz decided that she would not testify. When the state rested its case, the trial court addressed Berkovitz and explained to her that whether or not she testified was her decision. Specifically, the following exchange took place:

THE COURT: The other choice you have is to testify. And if you decide to do that your lawyer would call you as a witness, you would be placed under oath as all of the other witnesses have here in the trial, your lawyer would ask you questions and when he finished, [the prosecutor] could cross examine you just as your lawyers have been able to cross examine the witnesses that he had. So that is one of your choices and that is to take the stand and testify.

One of the things you should completely understand about that is that the choice to testify and the choice not to testify is your personal decision. It is not your lawyers' decision. It is your decision. Now, I counsel you and I advise you to consult with your lawyers about that choice and to listen carefully to what they have to say.

They are experienced in the defense of criminal matters. And I would ask them, I would say, "Counsel, what are the advantages of remaining silent? And what are the disadvantages?" And there are advantages and disadvantages in both. [I would also ask,] "Counsel, what are the advantages of testifying? What are the disadvantages of testifying?" And there are advantages and disadvantages of both. And I would listen carefully to what they had to say. I'd give what they had to say great weight.

But in the last analysis it is your decision, not theirs. And even if they advise you to testify and you don't want to testify, you don't have to. And if they advise you not to testify and you want to testify, you can. The decision is yours. I repeat my counsel to you that you should talk with them at length about it. You should listen carefully to what they have to say and you should give it great weight; but the decision is yours, not theirs.

Now, do you understand that you have the right to remain silent if you wish?

[BERKOVITZ]: Yes, I understand that.

THE COURT: Do you understand that if you decide to remain silent it would be up to you whether or not I mentioned it to the jury?

[BERKOVITZ]: That's correct.

THE COURT: And do you understand that you have the right to testify if you wish providing you take the oath and by doing so you subject yourself to cross examination? Do you understand that?

[BERKOVITZ]: Yes, I do.

THE COURT: And do you understand that the choice is yours alone?

[BERKOVITZ]: That's correct.

At the end of the trial, the defense rested without Berkovitz's testimony.

On May 4, 2004, the jury found Berkovitz guilty of both charges. On May 10, 2004, Berkovitz sent the trial court a letter stating that her trial counsel had refused to allow her to testify. The court considered Berkovitz's letter as a motion for a new trial and an evidentiary hearing was held. After the hearing, determining that Berkovitz was not denied the right to testify, the trial court denied the motion for a new trial. On June 18, 2004, Berkovitz was sentenced to life in prison for the first-degree murder conviction and to a consecutive 184–month imprisonment for the attempted murder conviction.

## I.

Berkovitz first claims that her trial counsel denied her the right to testify at her trial and therefore the trial court erroneously denied her motion for a new trial. In essence, she claims that her decision not to testify was coerced by her lawyers. A defendant's right to testify is a

constitutional right that can only be waived by the defendant. *State v. Walen,* 563 N.W.2d 742, 751 (Minn.1997) (citing *State v. Rosillo,* 281 N.W.2d 877, 878 (Minn. 1979)). Such waiver must be made voluntarily and knowingly. *Id.* (citing *United States v. Bernloehr,* 833 F.2d 749, 751 (8th Cir.1987)). The defendant's counsel cannot waive the defendant's right to testify, and a court is required to grant a new trial if it determines that counsel denied the defendant the right to testify. *Id.* at 750–51. If, however, a court determines that a defendant's decision not to testify was adversely affected by the counsel's failure to adequately inform the defendant about the relevant facts, a new trial will be granted only if the defendant was prejudiced by the error. *Id.* at 750 n. 3. A defendant has the burden of proving on appeal that she did not voluntarily and knowingly waive her right to testify. *Id.* at 751. Moreover, if the trial court record is silent as to waiver, a reviewing court must "presume that the decision not to testify was made by [the] defendant voluntarily and intelligently." *Id.* (quoting *State v. Smith,* 299 N.W.2d 504, 506 (Minn.1980)). Although, in the past, we have not directly addressed the issue, other courts have stated, in determining whether a defendant's lawyer has denied the defendant the right to testify, that coercion exists when the defendant's lawyer uses illegitimate means to prevent the client from testifying. *See, e.g., Lema v. United States,* 987 F.2d 48, 53 (1st Cir.1993); *Nichols v. Butler,* 953 F.2d 1550, 1553 (11th Cir.1992). A trial court's factual findings will be affirmed unless clearly erroneous. *State v. Linder,* 268 N.W.2d 734, 735 (Minn.1978). We review a trial court's denial of a motion seeking a new trial for an abuse of discretion. *State v. Varner,* 643 N.W.2d 298, 303 (Minn.2002).

In this case, the trial court held a hearing on Berkovitz's new trial motion to determine whether Berkovitz was denied the right to testify. At that hearing, Lugo, Homstad, and Berkovitz testified. Berkovitz testified that she always understood she had the right to testify at trial. She also acknowledged that Homstad sent her a letter on March 29, 2004, expressly stating that she "would have the right to testify" at trial. Berkovitz insisted, however, that when they met in person on May 2, 2004, her trial counsel would not allow her to testify and told her that "if we put you on the stand we're going to lose" because the prosecutor would take her words and use them against her. Berkovitz also testified that Homstad told her that he would not be able to present his closing argument if she testified.

According to her testimony, Berkovitz, at the end of the May 2, 2004, meeting, asked if Lugo was "a hundred percent sure" that she should not testify and Lugo responded, "A hundred five percent sure. If we should allow you to testify we are going to lose." In response, Berkovitz "relented" and said "okay." Berkovitz changed her mind the next day when the trial court finished advising her of her right to testify. When the court finished advising her, Berkovitz passed Homstad a note indicating she wanted to testify, at which point Homstad put his hand over the microphone and said, "Don't say anything." According to Berkovitz, she turned to Homstad and said, "Dan, I want to testify." Homstad said, "You agreed with us [on] Sunday at the jail not to [testify]," and Berkovitz responded, "But it's my decision." Homstad then asked the court for a recess. During the recess, Berkovitz claims her attorneys indicated that "they were not going to allow me to go on the stand," and Homstad again said, "I'm not going to be able to present my final arguments if we should allow you." Berkovitz contends that she did not say

anything in response. Berkovitz admitted that, although there were other occasions during the trial when she had disregarded her counsel's advice and spoke in court, when they went back to the courtroom after the recess she did not tell the trial court that she wanted to testify.

At the hearing, Lugo and Homstad testified that they did not improperly pressure Berkovitz or prevent her from testifying. They indicated that they always told Berkovitz that the decision as to whether she would testify belonged to her. They also testified that they told Berkovitz that "we would still try to defend her against the premeditation [element] even if she did testify" and felt that they "could defend [her] against premeditation."

According to Lugo and Homstad, to honor Berkovitz's desire to testify, they met with her on April 17, 2004, to prepare her trial testimony. In reference to that meeting, Homstad testified:

> We always told her that the decision to testify was hers alone. If she wanted to testify we would develop her testimony, we would prepare her with some role playing, by giving her some cross examination questions. We would go over any documents she thought might be useful to her testimony.
>
> * * * *
>
> We were frank in our advice about the effect we thought her testimony would have on the trial * * * we told her that there was only one person who knew what was going through her mind before the incident and the day of the incident and that was her. We told her that we thought [the prosecution] had some gaps in [its] evidence * * * missing some proof needed to establish premeditation. * * * We told her that if she testified in the way that she wanted to testify that she could possibly fill in those gaps and

help [the prosecution] establish premeditation.

At the meeting, Berkovitz "acknowledged that [the testimony she wanted to give] didn't help her case and in fact probably supported * * * the State's case."

Lugo and Homstad testified that during the May 2, 2004, meeting, Berkovitz again sought their advice about testifying at trial. Both Lugo and Homstad testified that during that meeting they stated to Berkovitz that they felt it would be in Berkovitz's best interest to remain silent. Berkovitz repeatedly asked if they were "one hundred percent sure of [their] advice" and Homstad testified that he "told her [he] was one hundred five percent sure of that." At the end of the meeting, Berkovitz stated that she would not testify.

Lugo and Homstad further testified that during the recess, after the court told Berkovitz that the decision to testify was hers alone, Berkovitz repeatedly asked, "What should I do?" When asked what made her change her mind about testifying, Berkovitz indicated that she thought her testimony would make a difference in her case. In response to one of her inquiries about what she should do, the lawyers told Berkovitz

> that there was no guarantee that this course of action would result in anything other than a conviction for first-degree murder. We told her that if she did not testify, there was a chance she might be convicted only of second degree and not first degree because we believed that you, the State, had some gaps in your case regarding premeditation.

They also told her that they were one hundred percent certain of their advice that she should not testify, but that it was her decision to make. In his testimony, Homstad noted that during the recess he made a conscious decision to maintain physical distance between himself and Ber-

kovitz "so that I would not appear that I was domineering over her or dominating her." At the end of that recess, Berkovitz said "all right, I will not testify." ·

The trial court made the following findings. At the beginning of the case, Berkovitz "expressed a desire to tell her side of the story" and her trial counsel "met with her with a view toward preparing [her] testimony." During the process, Berkovitz "began to get cold feet about the idea of testifying and began to ask them questions about the wisdom of testifying." Her trial counsel told Berkovitz that "it was not in her interests for her to testify" because her testimony would "plug up holes" on the issue of premeditation, and "it would be easier for the defense to argue that premeditation was not present if she did not testify." As a result of these discussions, Berkovitz did not wish to testify. However, after the trial court advised Berkovitz on her right to testify, Berkovitz "had some misgivings about that decision" and she "indicated to her counsel that she wanted to testify." Her counsel asked for a recess, and "they talked to her again [about whether or not she should testify]." After that conversation, Berkovitz "again decided that she didn't want to testify," and "[b]ased on that decision, [her trial counsel] rested the defense case without [Berkovitz's] testimony." Based on those findings, the trial court reached the following conclusions:

> [Berkovitz] knew she had the right to testify, that her lawyers were prepared, ready, willing and able to prepare her for testimony, that they commenced the preparation, and the only reason that they stopped the preparation was that she decided she didn't want to testify, and I find that at the last meeting in the holding cell again she decided voluntarily that she did not want to testify.

As noted above, this court will only reverse a trial court's factual findings if they are clearly erroneous. *Linder*, 268 N.W.2d at 735. Such is not the case here. Here, the record supports the trial court's observation that "in many areas, [the parties' versions of what had happened] aren't contradictory, and in many areas, [Berkovitz] just didn't talk about some of the things that [her counsel] talked about, and when she did[,] she put a different spin on it." Thus, in light of the record presented and the deference owed to the trial court's credibility determinations, we cannot say that the trial court erred when it found that, to the extent Berkovitz's version of events differed from her counsel's version, Berkovitz was wrong. Nor can we conclude, given the record presented, that the trial court's other findings were erroneous.

We next turn to whether Lugo and Homstad's actions denied Berkovitz the right to testify. From the record, it is clear that Berkovitz had a strong desire to testify at her trial. It is equally clear that Berkovitz both knew and understood that the right to testify was hers alone. Berkovitz acknowledged receiving the March 29, 2004, letter from Homstad that expressly stated that she "would have the right to testify." When the trial court explained in some detail her rights with respect to testifying, Berkovitz indicated that she understood those rights. Further, Lugo and Homstad met with Berkovitz with an eye toward preparing her testimony and told her "from very early on" that she had the right to testify.

In that Berkovitz knew and understood that she had the right to testify and that the decision to testify was hers alone, absent some indication in the record that her lawyers coerced her into not testifying by applying undue pressure, using illegitimate means, or otherwise depriving her of her free will, Berkovitz's claim must fail. Our

careful review of the record indicates that no undue pressure or illegitimate means were used to prevent Berkovitz from testifying. Nor was Berkovitz otherwise deprived of her free will. The fact that Berkovitz's trial counsel told her that they were one hundred and five percent certain that she would be convicted of premeditated first-degree murder if she testified in response to her question as to whether they were one hundred percent certain did not, on the facts presented here, rise to the level of coercion.

We therefore conclude that Berkovitz was not denied the right to testify at her trial. As a result, we also conclude that the trial court did not abuse its discretion when it denied Berkovitz's motion for a new trial.[1]

## II.

In her pro se supplemental brief, Berkovitz claims that: (1) her conviction should be reversed because she was not informed of her *Miranda* rights; (2) the trial court erroneously denied her motion for a change of venue; and (3) her trial counsel provided ineffective assistance. After a careful review of the record, we conclude that none of these claims has merit.

We note that the video recording taken while Berkovitz was being held in the secure room immediately after the shooting belies her claim that she was not advised of her *Miranda* rights and is therefore entitled to a new trial. Review of the video makes clear that Berkovitz was advised of her rights and, in fact, invoked them only to later spontaneously volunteer

information about the shooting. Indeed, a police detective can be seen on the video reminding Berkovitz that he could not talk to her about the shooting because she had invoked her right to counsel. To the extent that she contends that the warning heard on the recording of her custodial interview was "superimposed" after the fact, it is enough to say that Berkovitz offers no support for that claim nor have we been able to find any in the record.

Berkovitz's claim that the trial court erroneously denied her motion for a change of venue can be disposed of simply. To receive a new trial based on the denial of a change of venue motion as a result of pretrial publicity, a defendant must show that the publicity "affect[ed] the minds of the specific jurors involved in the case." *State v. Fratzke*, 354 N.W.2d 402, 406 (Minn.1984). Moreover, a reviewing court will not reverse a trial court's denial of a motion for change of venue unless such denial constituted a clear abuse of discretion and the defendant suffered actual prejudice. *Walen*, 563 N.W.2d at 748. Here, Berkovitz offers no evidence suggesting that the pretrial publicity surrounding her case affected any of the jurors who sat on her case or that the denial of her change of venue motion resulted in actual prejudice to her.

In order to succeed on an ineffective of assistance of counsel claim, a convicted defendant must show both that her counsel's performance fell below an objective standard of reasonableness and that, but for counsel's deficient performance, the outcome of the case would have been different. *Strickland v. Washington*, 466

---

1. We additionally note that the trial court did an excellent job of advising Berkovitz of her right to testify and in setting out its post-trial findings with respect to what took place between Berkovitz and her trial counsel. In *Walen*, we specifically noted that "placement on the record of a defendant's waiver of his right to testify often will save both the court and defense counsel considerable time at any postconviction proceeding." 563 N.W.2d at 751. Here, the court's record of the colloquy and the detailed factual findings provide a similar aid to this court.

U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Here, again, Berkovitz has failed to present any evidence supporting her claim. Moreover, our review of the record satisfies us that her counsel's performance did not fall below an objective standard of reasonableness. There being no deficiency in counsel's performance, Berkovitz's claim necessarily fails the prejudice prong of *Strickland* as well.

Therefore, we affirm Berkovitz's conviction.

Affirmed.